STATE OF CONNECTICUT *v.* URETEK, INC., ET AL.
(13183)

PETERS, C. J., HEALEY, SHEA, CALLAHAN, GLASS, COVELLO and HULL, Js.

Argued April 5—decision released June 7, 1988

*F. Timothy McNamara,* with whom were *Susan M. Cormier,* and, on the brief, *Kimberly A. Knox,* for the appellants (defendants).

*James G. Clark,* assistant state's attorney, for the appellee (state).

SHEA, J. The defendants, Uretek, Inc. (Uretek), and John Andrews, a vice-president of Uretek, were convicted by the trial court of the crime of knowingly storing hazardous waste without a permit to do so, a violation of General Statutes § 22a-131a (b).[1] In this appeal from the judgment, the only issue is whether the court erred in concluding that there was sufficient evidence to support the finding of guilt as to each defendant. We conclude that there was sufficient evidence to support the conviction of Uretek, but that insufficient evidence was adduced before Andrews rested his case to establish his guilt. Accordingly, we find error in part and remand the case to the trial court with direction to render a judgment of acquittal in favor of Andrews.

The trial court found the following facts. From May 15, 1984, to August 22, 1984, the time period specified in both the information and the bill of particulars, Uretek was a corporation doing business in the city of New Haven and was engaged in the process of coating fabrics with urethane. Andrews was responsible for the management of the chemicals employed in this manufacturing process. On May 15, 1984, and also on August 3, 1984, representatives of the state department of environmental protection (DEP) inspected the Uretek premises, and interviewed several officials of that corporation, including Andrews. On August 3,

---

[1] General Statutes § 22a-131a (b) provides: "Any person who knowingly transports hazardous waste to a facility which does not have a permit required under the Resource Conservation and Recovery Act of 1976, or who knowingly treats, stores or disposes of any hazardous wastes without a permit required under said act, or who knowingly violates any material condition or requirement of such permit, shall be fined not more than fifty thousand dollars for each day of violation or imprisoned not more than two years or both."

1984, agents of the DEP took a sample from each of six different fifty-five gallon drums, which were all located out-of-doors in the north yard of the Uretek premises. Each of the six samples taken was placed into two separate containers. These samples were later found to contain several hazardous chemicals that are regulated pursuant to the federal Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. § 6901 et seq. (1982), which is specifically incorporated into General Statutes § 22a-131a (b).[2] Including the bar-

---

[2] The court found that the six samples contained the following chemicals:

"Micrograms per kilogram

Sample #1: (#3096-3097)

| | |
|---|---|
| benzene | 11,000 |
| ethyl benzene | 60,000 |
| methylene chloride | 6,400 |
| methyl ethyl ketone | 140,000 |
| toluene | 8,300,000 |
| ortho xylene | 190,000 |

Sample #2: (#3088-3089)

| | |
|---|---|
| benzene | 17,000 |
| ethyl benzene | 100,000 |
| methylene chloride | 300,000 |
| methyl ethyl ketone | 230,000,000 |
| toluene | 100,000,000 |
| mixed xylene | 340,000 |

Sample #3: (#3090–3091)

| | |
|---|---|
| benzene | 45,000 |
| ethyl benzene | 260,000 |
| methylene chloride | 360,000 |
| methyl ethyl ketone | 320,000,000 |
| toluene | 70,000,000 |
| trichloroethylene | 5,700,000 |
| mixed xylenes | 250,000 |

Sample #4: (#3092–3093)

| | |
|---|---|
| benzene | 3,000 |
| ethyl benzene | 20,000 |
| methyl ethyl ketone | 6,000,000 |

rels that were sampled, there were approximately 300 barrels in the north yard, fewer than ten of which were empty. All of the barrels were fifty-five gallon size drums.

As applied to the informations charging each defendant with violating its provisions, § 22a-131a (b) imposes criminal penalties upon "[a]ny person who knowingly . . . stores or disposes of any hazardous wastes without a permit required under" the RCRA. In each information, the state charged that the defendant had "knowingly stored and disposed of more than ten containers of hazardous waste without a permit to do so" in violation of the statute. The trial court concluded that

| | |
|---|---|
| toluene | 47,000,000 |
| mixed xylenes | 60,000 |
| | |
| Sample #5: (#3094–3095) | |
| ethyl benzene | 85,000 |
| methyl ethyl ketone | 88,000,000 |
| toluene | 100,000,000 |
| mixed xylenes | 170,000 |
| | |
| Sample #6: (#3098–3099) | |
| benzene | 3,400 |
| ethyl benzene | 260,000 |
| methylene chloride | 95,000 |
| methyl ethyl ketone | 65,000,000 |
| mixed xylenes | 270,000" |

The federal Environmental Protection Agency has duly promulgated regulations pursuant to the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq. (1982), that identify certain chemicals as hazardous wastes. The court found that the defendants had illegally stored and disposed of ethyl benzene, toluene and methyl ethyl ketone, hazardous chemicals regulated pursuant to 40 C.F.R. § 261.31. It also found that the defendants had illegally stored and disposed of benzene, methylene chloride, methyl ethyl ketone, toluene and trichloroethylene, hazardous chemicals regulated pursuant to 40 C.F.R. § 261.33. The defendants concede that these chemicals were present in the samples, but have raised several arguments, which are examined in the text of this opinion, in support of their contention that they did not violate General Statutes § 22-131a (b). The state has conceded that there is insufficient evidence to prove that the defendants violated federal regulations concerning benzene.

each element of the offense as charged had been proved beyond a reasonable doubt for both defendants.

I

URETEK, INC.

Uretek does not challenge the sufficiency of the evidence to establish the "knowingly" requirement of the statute. Uretek contends, however, that the state failed to meet its burden of proof beyond a reasonable doubt in regard to four other essential elements of the crime as charged in the information. It maintains that the state failed to prove: (1) that Uretek had "stored" more than fifty-five gallons of hazardous waste by keeping such materials on its premises for longer than one year; (2) that more than ten containers of hazardous waste were stored on its premises; (3) that the chemicals in the containers were "spent," a requirement of the "hazardous waste" definition in 40 C.F.R. § 261.31, or that they were "discarded," a requirement of such definition in 40 C.F.R. § 261.33; and (4) that more than 1000 kilograms of hazardous waste had accumulated on its premises so that the permit requirement of the RCRA and § 22a-131a (b) would be applicable. The state claims that it proved these four elements beyond a reasonable doubt.

"In reviewing claims concerning the sufficiency of the evidence, we will construe the evidence in the light most favorable to sustaining the [judgment], and will affirm that [judgment] if it is reasonably supported by the evidence and the logical inferences drawn therefrom. *State* v. *Vincent,* 194 Conn. 198, 206, 479 A.2d 237 (1984); *State* v. *Perez,* 182 Conn. 603, 606, 438 A.2d 1149 (1981)." *State* v. *Cates,* 202 Conn. 615, 627, 522 A.2d 788 (1987).

A

STORAGE FOR MORE THAN ONE YEAR

Section 22a-131a (b) applies to a person who either "stores or disposes" of hazardous waste. The informations charged that each defendant had both "stored and disposed" of such material. The trial court concluded that the term "stored" must be related to the definitions of "short-term storage" and "long-term storage" in General Statutes § 22a-115. Section 22a-115 (5) defines "short-term storage" to mean "the holding of individual containers of hazardous waste in such a manner as not to constitute disposal of such hazardous waste." "[A]ny facility used only for the short-term storage of hazardous waste" is excluded by General Statutes § 22a-117 (b) (3) from the application of General Statutes §§ 22a-114 through 22a-130, which pertain to the certification, construction and operation of hazardous waste facilities. The trial court, accordingly, did not rely upon short-term storage but upon its finding of long-term storage in concluding that the defendants had violated § 22a-131a (b).

Section 22a-115 (6) provides that "long-term storage" means "the holding of more than fifty-five gallons or five hundred pounds, whichever amount is greater, of hazardous waste at one site for longer than one year." Such long-term storage without a necessary permit would constitute a basis for finding that a person had stored hazardous waste in violation of § 22a-131a (b). It would also support the finding of such a violation upon the alternative statutory ground that one had disposed of hazardous waste, because the term "disposed" is defined by § 22a-115 (3) to include "long-term storage . . . of hazardous waste" as one of several alternative methods of such disposition. Thus, the trial court properly concluded that its finding of long-

term storage warranted the conclusion that Uretek had both stored and disposed of hazardous waste as the information charged, although either act would constitute a violation of § 22a-131a (b) and support the conviction. The trial court found that substantially more than ten fifty-five gallon drums of hazardous waste had been stored in the north yard of Uretek for longer than one year for long-term storage. Uretek contends that there was insufficient evidence to support this finding.[3]

To prove the duration of the period for which hazardous waste had been stored by Uretek, the state presented Gerald Hanahan, an inspector from the office of the chief state's attorney, who testified that Andrews had told him on September 4, 1984, that approximately 150 of the barrels in the north yard were fire-damaged virgin (brand new) stock that had been there since a fire took place at Uretek in 1979. Peter Zack, an inspector for the DEP, testified that Andrews had told him on May 15, 1984, that some of the drums in the north yard were left over from a fire. Uretek introduced into evidence as an exhibit an insurance claim form in which it sought compensation for damage as a result of this 1979 fire to at least 152 drums of material, including ten drums of toluene, eight drums of methyl ethyl ketone (MEK), and fifteen drums of a "rinse solvent" that was composed either of MEK or methylene chloride.

---

[3] Uretek also contends that the state is precluded from establishing storage for a period of more than one year because the information and bill of particulars alleged that it had committed the offense from May 15, 1984, until August 22, 1984. The dates in the information, however, merely specified the period of time during which the state claimed that a violation of the statute had accrued. To prove such a violation of "long-term storage" the state was limited by the information to proving that the containers of hazardous waste on which it relied had been stored on the premises more than one year before the dates of the inspections in which those containers were found on the premises. The offense had not occurred until after the hazardous waste had been stored for more than one year.

Uretek concedes that Andrews made these admissions to Hanahan and Zack. It contends, however, that these admissions cannot be used against it because the state did not present independent evidence to establish the corpus delicti. See *State* v. *DelVecchio,* 191 Conn. 412, 427–28, 464 A.2d 813 (1983). Uretek did not object to the testimony of either Zack or Hanahan regarding these admissions, and never sought a motion for acquittal on the basis of the lack of corpus delicti evidence. Uretek's corpus delicti claim does not implicate a fundamental constitutional right, and, therefore, this court will not review this contention. *State* v. *George,* 194 Conn. 361, 372, 481 A.2d 1068 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 963, 83 L. Ed. 2d 968 (1985); *State* v. *Gooch,* 186 Conn. 17, 18, 438 A.2d 867 (1982); *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973).

Uretek also contends that the trial court could not reasonably have found that 150 barrels of fire-damaged virgin stock remained in the north yard in 1984 in light of Richard Fiore's testimony that he had removed some fire-damaged barrels in 1981 from Uretek. Fiore was an employee of East Coast Environmental, a licensed contractor that Uretek engaged to remove hazardous waste from its premises. Fiore testified, however, that he did not have a laboratory analysis prepared concerning the materials taken by him in 1981, and that he was unable to recall what materials he had removed at that time. We conclude that the trial court's determination that approximately 150 drums of fire-damaged virgin stock had remained in the north yard for about four years was adequately supported by the evidence and the logical inferences drawn therefrom. *State* v. *Cates,* supra.

Including the 150 drums of fire-damaged virgin stock that had never been used, the trial court found that the Uretek north yard contained a total of 300 fifty-five

gallon drums, fewer than ten of which were empty. The court also found that "30 to 40 drums that were checked were substantially full." Subtraction of the 150 drums of unused virgin stock from the total of 300 drums left 150 drums of material that had been used by Uretek in the manufacturing process. It was from six of these barrels containing used material that the samples were taken that were found to contain hazardous chemicals. There was, however, no testimony directly specifying the length of time any of the 150 drums of used material had remained on the premises.

In the information, the state had undertaken to prove storage of "more than ten containers of hazardous waste" for more than one year and was not required to prove that any greater quantity had remained on the premises for that period. There was substantial circumstantial evidence from which the court could draw a reasonable inference that more than ten of the 150 drums of used material had been in the north yard for longer than one year. Photographs of the site introduced into evidence as exhibits showed that sumac trees, underbrush and bushes had grown around several pallets supporting four drums each. As the court found, many drums were inaccessible, and the vegetation around these drums was undisturbed. In one photograph, thirty drums may be counted that appear to be surrounded by undisturbed vegetation that the court could reasonably conclude had taken more than one year to grow. Another photograph shows fifteen drums stacked on pallets that are inaccessible by fork-lift trucks because of an accumulation of rusted pipes and other discarded items, including a lunch cart that testimony of Andrews indicated had been placed there in February, 1983, more than one year before the first inspection made by the DEP on May 15, 1984.

The defendants do not challenge the finding that Uretek generated waste at the rate of about one fifty-five

gallon drum per month. The equivalent of only thirty drums of waste was removed from the entire Uretek property between May 7, 1981, and August 3, 1984, a period during which approximately thirty-nine drums of waste would have been produced at the normal rate. Of these thirty-nine drums, the court could reasonably infer that only twelve had accumulated during the year preceding August 3, 1984, when the DEP made its last inspection, and that the remaining twenty-seven drums, together with the balance of the 150 drums containing used materials, had been in the north yard for longer than one year.

In reviewing claims concerning the sufficiency of the evidence, this court makes no distinction between the probative force of direct and circumstantial evidence. *State* v. *Cates,* supra. Based on the amount of waste produced per month at Uretek, the amount of waste removed from its premises between May 7, 1981, and August 3, 1984, and the photographic evidence indicating the manner in which the drums had been stored, the growth of vegetation around them and their virtual inaccessibility, it was reasonable for the court to infer that substantially more than ten drums of waste had been stored in the north yard for longer than one year in addition to the 150 barrels of fire-damaged virgin stock.

## B

### TEN CONTAINERS

We note initially that the RCRA requires that a small quantity generator of hazardous waste producing less than 1000 kilograms per month obtain a permit only if it accumulates more than 1000 kilograms of such material. 40 C.F.R. § 261.5. It is undisputed that Uretek is a small quantity generator. Accordingly, the state alleged in the information that Uretek had stored "more than ten containers of hazardous waste with-

out a permit to do so'' on the assumption that ten full fifty-five gallon drums of the chemicals found in the six samples taken by the DEP would amount to more than 1000 kilograms of hazardous waste. The state concedes that it must prove that more than ten containers of hazardous waste were stored in the north yard for longer than one year.

Uretek contends that, even if more than ten drums were in the north yard for longer than one year, the court could not reasonably infer that more than ten of these drums contained hazardous waste when the DEP took samples from only five barrels and a container inside another.

We need not decide whether the court could reasonably infer that more than ten drums contained hazardous waste based on the six samples alone. In addition to the evidence that the six samples were taken from barrels in different locations in the north yard, Harold Hoder, Uretek's president, testified that the material in the drums in the north yard was ''almost homogeneous'' and ''contain[ed] the same product as the new drums.'' On the basis of Hoder's testimony, the court reached the conclusions that the substances in the north yard were homogeneous, that the reusable drums contained the same product as the new drums and that the contents of all the drums were generic.

Uretek argues that Hoder's admissions did not provide a sufficient basis for the court to infer beyond a reasonable doubt that the other drums contained the same contents as the sampled drums. Uretek does not claim, however, that its president was uninformed in regard to the contents of the drums in the north yard. Furthermore, Hoder's testimony is consistent with the evidence that the six barrels, which were sampled at various locations in the north yard, contained largely the same chemicals, although in different mixtures. All

six samples contained ethyl benzene, ortho or mixed xylene, and MEK. Four samples contained both benzene and toluene. Four samples contained methylene chloride. There was also evidence that these waste materials had been generated in Uretek's manufacturing process that had not changed in four years.

There was more than enough evidence for a reasonable trier of fact to conclude that more than ten of the barrels in the north yard contained essentially the same materials as found in the six samples. *State* v. *Silano,* 204 Conn. 769, 785–86, 529 A.2d 1283 (1987).

### C

#### HAZARDOUS WASTE

Section 22a-131a (b) applies to the storage or disposition of those hazardous wastes for which a permit is required under the RCRA. The federal Environmental Protection Agency (EPA) has promulgated regulations identifying certain chemicals as hazardous under specified circumstances, of which two are pertinent to this case, 40 C.F.R. §§ 261.31 and 261.33. The trial court found that Uretek had violated § 261.31 by storing without a permit ethyl benzene, toluene and MEK.[4] It also found that Uretek had violated § 261.33 by storing without a permit methylene chloride, MEK, toluene and trichloroethylene.[5]

### 1
### 40 C.F.R. § 261.31

Uretek contends that there was insufficient evidence to prove that it violated § 261.31 because the state failed to prove that the solvents in the drums were "spent," a requirement of that section. It maintains that a solvent is spent only if it cannot be reused for its original intended purpose.

---

[4] See footnote 2, supra.

[5] See footnote 2, supra.

The state argues that a solvent is "spent" when it has been used for its original intended purpose, and (a) it is either being discarded, so that its intended use has ceased, or (b) it chemically cannot be used again for that purpose. The state acknowledges that its proposed definition of "spent" requires a determination of the subjective intentions of the user, in contrast to the objective definition proposed by Uretek.

There is no regulation officially defining "spent" in § 261.31. The federal courts, however, routinely refer to the EPA commentary concerning the interpretation of RCRA and its regulations. *Environmental Defense Fund, Inc.* v. *Lamphier*, 714 F.2d 331, 336 (4th Cir. 1983); *United States* v. *Waste Industries*, 556 F. Sup. 1301, 1303 (E.D.N.C. 1982); *O'Leary* v. *Moyer's Landfill, Inc.*, 523 F. Sup. 642, 656–57 (E.D. Pa. 1981). The EPA has issued the following commentary in regard to § 261.31: "For those *used materials* which are listed [in §§ 261.31 and 261.32] or § 261.33 (e.g., spent solvents), the point at which they meet the listing description is somewhat less well-defined, *but generally occurs when their intended use has ceased, and they begin to be accumulated or stored for disposal, re-use or reclamation.*" (Emphasis added.) 45 Fed. Reg. 33,095, col. 3 (1980). We note that the fire-damaged virgin stock might not fit within this definition because this material had never been "used" and thus might not fall within the "used materials" category to which the commentary pertains.

The EPA commentary indicating that solvents are spent "when their intended use has ceased, and they begin to be accumulated or stored for disposal, re-use or reclamation" is consistent with Congressional intent in this area. Congress intended that the RCRA would provide for "a 'cradle-to-grave' regulatory scheme for toxic materials, providing 'nationwide protection against the dangers of hazardous waste disposal.' H.R.

Rep. No. 1491, 94th Cong., 2d Sess. 11, reprinted in 1976 U.S. Code Cong. & Ad. News 6238, 6249." *United States* v. *Johnson & Towers, Inc.,* 741 F.2d 662, 666 (3d Cir. 1984), cert. denied sub nom. *Angel* v. *United States,* 469 U.S. 1208, 105 S. Ct. 1171, 84 L. Ed. 2d 321 (1985).

"[W]here a statute is capable of two constructions, one that is rational and effective in accomplishing the evident legislative object, and the other leading to 'bizarre results' destructive of that purpose, the former should prevail." *State* v. *Williams,* 206 Conn. 203, 210, 536 A.2d 583 (1988). Uretek's proposed definition of "spent" solvent would allow a generator or user of hazardous waste to store such material indefinitely as long as there is a remote possibility that it might be reused in the distant future. Such a construction of "spent" is clearly inconsistent with the Congressional goal in the RCRA of providing "cradle-to-grave" regulation of hazardous wastes.

We hold that a solvent is spent when it has been used for its original intended purpose, and it is either (a) discarded or (b) can no longer be used again for that purpose. As we have previously indicated, the 150 drums of fire-damaged virgin stock were never used and, therefore, may well fall outside the scope of § 261.31. There was ample evidence, however, that the remaining 150 barrels in the north yard had been used at some time in the manufacturing process. As explained in parts I A and B of this opinion, the court properly concluded that more than ten of these 150 barrels had been stored for longer than one year and that all these barrels contained essentially the same waste as was found in the six DEP samples. In light of Hoder's testimony that it was "unlikely" that any barrels in the north yard would again be used in manufacturing, we conclude that the trial court did not err in finding that the materials

in these barrels had been discarded and thus were "spent" under § 261.31.[6]

The trial court based its finding that hazardous waste was contained in the 150 drums of used materials stored in the north yard of the Uretek premises upon the chemical analysis of the six samples taken on August 3, 1984. The report of this analysis indicated the presence of quantities of ethyl benzene, MEK and toluene. These chemicals are classified by § 261.31 as nonhalogenated solvents constituting "hazardous wastes from non-specific sources" when they are "spent." Thus, we conclude that the trial court did not err in finding that the 150 drums of used material contained chemicals constituting hazardous waste when Uretek no longer had any intention of reusing the contents of these drums in its manufacturing process.

## 2

## 40 C.F.R. § 261.33

The trial court also concluded that some additional chemicals disclosed by the analysis of the samples, benzene, methylene chloride and trichloroethylene, constituted hazardous wastes under § 261.33. These chemicals are included in this regulation concerning discarded commercial chemical products in subsection (f), but subsection (a) limits the scope of § 261.33 to "[a]ny commercial chemical product, or manufacturing chemical intermediate having the generic name listed" in subsection (f). The EPA comment upon § 261.33 (d) states that this section applies only to a substance "which consists of the commercially pure grade of the chemical, any technical grades of the chemical that are produced or marketed, and all formulations in which

---

[6] After August 22, 1984, Uretek did use some of the materials in the north yard for a new product line. There is no evidence that Uretek intended to use these materials prior to August 23, 1984.

the chemical is the sole active ingredient." 40 C.F.R. § 261.33 (d), comment, p. 38. The testimony of Hoder that all of the drums in the north yard held substantially the same material, when combined with the report of the analysis of the samples taken from six of those drums, indicates that a number of different chemicals mixed together were contained in the 150 barrels of used materials in the north yard. There was no testimony that any of these samples constituted a commercially pure grade of any chemical, any technical grade produced or marketed or any formulation in which the chemical was the sole active ingredient.

It is conceivable that the 150 drums of fire-damaged virgin stock in the north yard, which we have concluded might not have contained "spent" chemicals but materials that had never been used, might have included some drums of "commercially pure" grades of chemicals that would constitute hazardous waste under § 261.33 when "discarded or intended to be discarded." The state, however, presented no evidence concerning the contents of these fire-damaged unused barrels. The state argues that from the evidence of Uretek invoices relating to purchases made in 1984 of 192 drums of toluene, 206 drums of MEK, 136 drums of methylene chloride and eight drums of trichloroethylene the inference can be drawn that the virgin stock damaged in a fire four years earlier included several "commercially pure" barrels of such chemicals because the manufacturing process remained the same. We need not consider this claim further, however, because the trial court drew no such inference but based its finding of hazardous waste under § 231.33 upon the analysis of the samples taken from the drums of used materials. The court erroneously assumed that, because the samples contained chemicals listed in § 231.33 which "were intended to be discarded," these chemicals fell within the classification of hazardous waste without consider-

ing whether they were in a "commercially pure" form. In any event, since we have concluded that the 150 drums of used materials did contain "spent" chemicals identified as hazardous waste under § 261.31, it is immaterial whether these chemicals also fall within the hazardous waste classification of § 261.33.

The trial court determined that Uretek violated § 261.33 by discarding methylene chloride and trichloroethylene. We conclude that this determination was erroneous because there was no evidence indicating that these two substances were discarded while in a chemically pure form, but that this error does not affect the conviction insofar as it rests upon the storage of hazardous waste falling within the § 261.31 classification.

## D

### PERMIT

Since § 22a-131a (b) applies only to the treatment, storage or disposition of hazardous wastes without a permit required under the RCRA, the state was obliged to prove that Uretek had accumulated more than 1000 kilograms of hazardous waste on its premises at the time of the inspection of August 3, 1984. As a "small quantity generator," producing less than 1000 kilograms of such waste per month, Uretek would not have required a permit under the RCRA until it had accumulated more than that quantity of such waste on its premises. 40 C.F.R. § 261.5 (a) and (f).

The report of the analysis of the samples indicates that toluene and MEK, both of which chemicals are classified as hazardous waste under § 261.31, constituted all but a relatively insignificant portion of each sample. The lightest of these, MEK, weighs 366 pounds per fifty-five gallon drum. The equivalent of 1000 kilo-

grams is 2200 pounds, which would equal the weight of 6.01 drums of MEK.

Our conclusion that the evidence supported the finding of the trial court that there were at least ten full drums of hazardous waste in the Uretek north yard for more than one year, as discussed in parts I A, B and C above, indicates that Uretek had accumulated more than 1000 kilograms of hazardous waste by August 3, 1984, and, therefore, a permit was required for that purpose. The additional finding of the court that Uretek had no permit is not disputed.

### E

On the basis of all the foregoing, we hold that there was more than sufficient evidence for the trial court to conclude that each necessary element of § 22a-131a (b) had been proved beyond a reasonable doubt against Uretek. *State* v. *Silano,* supra; *State* v. *Cates,* supra.

### II

Andrews filed a motion for a judgment of acquittal at the close of the state's evidence. The court reserved its decision on the motion and denied it after the conclusion of the trial. Practice Book § 883. Andrews rested his case without offering any evidence. Uretek proceeded with its defense. It was during Uretek's presentation that Hoder testified that all the barrels in the north yard contained essentially the same materials as were found in the six DEP samples. Because the trial court could not properly have used the testimony of Hoder in deciding whether Andrews' motion for acquittal should have been granted, we must consider whether the conviction of Andrews may be upheld without reliance upon Hoder's testimony. We conclude that the evidence presented by the state before Andrews rested his case was insufficient to support his conviction.

Unless the component chemicals contained in the six samples analyzed can be extrapolated to at least ten of the 150 drums of used materials in the Uretek north yard, the state cannot prevail in proving that a sufficient quantity of hazardous waste had been accumulated to require an RCRA permit or to prove that there were more than ten drums of such waste as alleged in the information. Except for Hoder's testimony concerning the homogeneity of the contents of the drums in the north yard, the only other proof of this element of the offense was that the six samples had been taken from separate barrels at different locations in the yard. It does not appear that the court relied wholly upon this evidence in drawing its inference of the similarity of the contents of the unsampled barrels to those that were sampled. For this finding the court relied on Hoder's testimony that the substances in the drums in the north yard were "almost homogeneous" and that the reusable drums "contain[ed] the same product as the new drums." Accordingly, the court concluded that the contents of all the drums were generic. We need not consider, therefore, whether there was sufficient evidence, apart from Hoder's testimony, that the six samples were representative of the remaining barrels. It is clear that the trial court rested its finding of homogeneity, not upon the evidence that the sampling was representative, but upon Hoder's testimony that cannot be used against Andrews.

The state argues that an inference of homogeneity is also supported by evidence of purchases by Uretek of hazardous chemicals, such as those found in the samples, made between March and August, 1984. These purchases were evidenced by invoices introduced during the state's case-in-chief. The state claims that, because there was testimony that the manufacturing process had not changed, it may be inferred that the same chemicals were contained in the drums located

in the north yard for more than one year before these purchases. Again, we need not decide whether such an inference could be drawn pursuant to the standard of proof required in a criminal case. The trial court plainly drew no such inference but relied wholly on Hoder's testimony in finding that the samples were representative. Accordingly, we hold that the court erred in denying Andrews' motion for acquittal.

There is error in part, the judgment is set aside as to the defendant Andrews and the case is remanded to the trial court with direction to render judgment of acquittal in favor of that defendant.

In this opinion the other justices concurred.