STATE OF CONNECTICUT *v.* BLAS OLIVERAS
(13282)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and COVELLO, Js.

Argued January 4—decision released April 18, 1989

*Louis S. Avitabile,* special public defender, with whom were *Denise Dishongh,* special public defender, and, on the brief, *Leonard Caine,* special public defender, for the appellant (defendant).

*John O'Meara,* deputy assistant state's attorney, with whom, on the brief, were *John Connelly,* state's attorney, and *Peter Markle,* former assistant state's attorney, for the appellee (state).

SHEA, J. After a jury trial the defendant, Blas Oliveras, was convicted of felony murder in violation of General Statutes § 53a-54c.[1] In this appeal he claims

---

[1] General Statutes § 53a-54c provides in part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance

that the trial court erred in: (1) denying his motions for acquittal at the close of the state's case-in-chief and at the close of all the evidence; (2) instructing the jury on the effect of certain statements of the defendant introduced as admissions; and (3) refusing to declare a mistrial because of alleged prosecutorial misconduct in attempting to bring inadmissible evidence before the jury. We find no error.

From the evidence presented the jury could reasonably have found the following facts. On March 11, 1986, Robert Chrisman, who was twenty-two years old, left his apartment on Cherry Street in Waterbury at about 7:45 p.m. to go to a convenience store one block away. His fiancee, with whom he occupied the apartment, had given him two dollars to purchase cigarettes at the store. He was wearing a blue coat, jeans and a T-shirt at the time.

At about 7:52 p.m., several Waterbury policemen were dispatched to the scene of a stabbing on Cherry Street. Upon arrival they discovered a body, later identified as Chrisman's, lying face up on the ground, with two stab wounds in the chest. The body was removed from the scene by ambulance. An autopsy performed the next day disclosed that Chrisman had died from the two stab wounds in his chest, which had penetrated his heart and left lung. Found at the scene were a black Kangol hat, a cigarette case containing a pack of New-

of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to belive that any other participant intended to engage in conduct likely to result in death or serious physical injury."

port cigarettes, a cigarette lighter, a blue coat, and a trail of blood extending from the area of the body for a distance of thirty to fifty feet.

Chrisman's fiancee had been talking on the telephone when she observed from the apartment window the flashing lights of the police cars that had arrived. She went outside where a group of people had gathered and then she noticed the blue coat on the ground, the victim's body having been removed before her arrival. Later she identified Chrisman's body.

The cigarette case, cigarettes and lighter found on the sidewalk near the victim's body were later identified as belonging to Jose Quintana. The hat, similar to the one the defendant customarily wore, contained hairs like those in the hair sample taken from the defendant.

Later that same evening, B, a woman who was a friend of Quintana, received a telephone call from him, in which he mentioned that there had been trouble on Cherry Street and he asked her to call the hospital to inquire about the condition of a white male with blonde hair, a description corresponding to that of Chrisman. She refused to make the call. In another telephone conversation the next day, B asked Quintana about the stabbing incident on Cherry Street that she had heard of in a news broadcast. Quintana replied that he had been "hanging around" on Cherry Street with the defendant. He told B that the victim had started a fight with him and that he had stabbed the victim in self-defense.[2]

Later in the week following the murder, Quintana had a conversation with Gregorio Hernandez who testified for the state. Quintana told Hernandez that he

---

[2] This testimony was introduced by the defendant without objection after Quintana had exercised his privilege not to testify.

and the defendant had committed the murder on Cherry Street. They had waited outside the store for the victim. When the victim refused to give them his money, they punched him and then Quintana stabbed him.[3]

Hernandez conversed with the defendant later on the day of his conversation with Quintana. After Hernandez asked the defendant about the murder on Cherry Street, the defendant responded that he and Quintana had committed that crime. He said that he and Quintana had wanted money so that they could "get high." When the victim refused to give them money, they both punched him. The defendant then gave Quintana a knife, which he used to stab the victim.

I

The defendant's claim that his motions for a judgment of acquittal should have been granted for insufficiency of the evidence presupposes that the testimony of Hernandez concerning the defendant's account of the circumstances of the attempted robbery and murder cannot be relied upon in determining whether there was sufficient evidence to support the verdict of guilty. Although no objection was raised to the admissibility of his statements to Hernandez, the defendant contends that this testimony must be disregarded because of the rule that a confession cannot stand alone, but must be accompanied by other sufficient evidence of the corpus delicti. *State* v. *Ruth,* 181 Conn. 187, 198, 435 A.2d 3 (1980).

---

[3] This testimony was introduced by the state on redirect examination without objection after the defendant had cross-examined Hernandez concerning his conversations with Quintana. We need not consider whether this hearsay evidence standing alone would adequately support the verdict because of our conclusion that the defendant's admissions to Hernandez, which are substantially the same as Quintana's account of the crime, may properly be relied upon.

In arguing his motions for acquittal, the defendant never mentioned the corpus delicti rule or its underlying principles, but contended only that Hernandez' testimony could not be relied upon because of the many inconsistent statements that he had allegedly made. This court does not ordinarily review claims not raised in the trial court. Practice Book § 4185. Recognizing this barrier to review, the defendant maintains that the corpus delicti rule has constitutional import in that it implicates the state's burden to prove guilt beyond a reasonable doubt. On that basis he claims that the issue is reviewable under the exception established in *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973), "where the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial."

In *State* v. *Uretek, Inc.,* 207 Conn. 706, 713, 543 A.2d 709 (1988), we summarily rejected a claim that the lack of extrinsic corroboration of an admission that was vital to proving an element of the offense implicated a fundamental constitutional right and, therefore, concluded that such a claim did not qualify for review under *Evans.* The defendant relies upon a similar expansive version of the corpus delicti rule in seeking review of his contention that his statements to Hernandez indicating an attempt to rob the victim were the only evidence of the underlying felony essential to support a conviction of felony murder. In *State* v. *Tillman,* 152 Conn. 15, 20, 202 A.2d 494 (1964), this court abandoned our previous definition of the corpus delicti "as meaning the fact that the crime charged was committed by someone." We adopted the definition that "the corpus delicti consists of the occurrence of the specific kind of loss or injury embraced in the crime charged." Id. "Under it, in a homicide case, the corpus delicti is the fact of the death, whether or not feloniously caused, of the person whom the accused is charged with hav-

ing killed or murdered." Id. In *State* v. *Ruth,* supra, we applied this definition in a felony murder case, like the present one, where the underlying felony was a robbery. We concluded that the corpus delicti rule was satisfied simply by the ample evidence of the victim's death and, therefore, the defendant's confession could be used to prove the other elements of the crime.

We need not now decide whether a claim that there was no proof of the corpus delicti, as we have defined it, from evidence independent of the confession or admissions of an accused would warrant review under *Evans* as implicating a constitutional right. The evidence of the victim's death is abundant and the defendant does not challenge its adequacy. Thus, the corpus delicti rule has been satisfied within the scope of our definition of that requirement in a homicide case. We reject the defendant's contention that the reliance by the trial court, in denying his motions for acquittal, upon his statements to Hernandez concerning the attempted robbery, which may not have been corroborated by independent evidence of that crime,[4] violated his constitutional rights.

## II

The defendant next claims error in the charge to the jury in three respects, none of which were called to the attention of the trial court by a request to charge or an exception at the conclusion of the charge. He seeks review of these claims as having constitutional implications cognizable under *Evans,* because he maintains that they involve the effect to be given by the jury to his admissions and implicate his right to a fair trial. We find no reversible error.

## A

The defendant claims that the charge permitted the jury to rely upon his admissions to prove the offense

---

[4] See footnote 3, supra.

"without reference to the necessity of the admissions being first corroborated by substantial and material other evidence apart from those admissions." He refers to the absence of any instruction upon the need for corroboration from independent evidence of the fact that the crime charged has been committed before reliance may be had upon the admissions of an accused.

In effect the defendant claims that the jury should have been advised that each element of the crime of felony murder had to be shown by evidence independent of the defendant's statements in order to prove that "the crime had been committed by someone." This concept of the corpus delicti requirement, however, we expressly abandoned in *Tillman,* as explained in part I. Our present requirement for corroboration in a homicide case, including a charge of felony murder, is simply that the death of the victim be demonstrated by independent evidence. In this case, since Chrisman's death was established beyond question, there was no need for any special instruction concerning the necessity for corroboration of the defendant's admissions. Accordingly, no further review of this claim of error is warranted.

## B

The court instructed the jurors that they were the "exclusive judges" of whether the defendant had made the statement describing the occurrence of the crime, as Hernandez had testified. The jurors were also told that, if they found this statement entirely untrue, they must reject it, but that, "[i]f you find that it is true, in part, you may consider that part which you find to be true." The defendant contends that this instruction may have "misled the jury into believing that they could find the existence of the attempted robbery from the statement, believing the part of the statement as to the

stabbing by Quintana while disbelieving the part of the statement as to the existence of the attempted robbery."

There is nothing in the portion of the charge under attack that can reasonably be construed to have misled the jury, as the defendant argues. The charge is a correct statement of the law and cannot reasonably be viewed as creating any confusion about the necessity for the jury to find the element of an attempted robbery as the underlying felony before returning a guilty verdict. The court adequately explained the elements of the offense of attempted robbery and the necessity for proof of this element of the charge beyond a reasonable doubt. The defendant's claim that the jury was misled in such a manner as to violate his constitutional rights is frivolous.

C

The court also charged the jury that the fact that the defendant had told Hernandez of his involvement in the crime before he was aware of any accusation against him was a circumstance from which the jury could infer consciousness of guilt. We agree with the defendant that the charge was inappropriate but conclude that it was harmless.

Evidence that an accused has taken some kind of evasive action to avoid detection for a crime, such as flight, concealment of evidence, or a false statement, is ordinarily the basis for a charge on the inference of consciousness of guilt. *State* v. *Milner,* 206 Conn. 512, 519, 539 A.2d 80 (1988); *State* v. *Banks,* 194 Conn. 617, 621–22, 484 A.2d 444 (1984). The giving of a statement whose truth the state relies upon to prove the defendant guilty, as in this case, can hardly be regarded as deceptive conduct of the kind justifying such an inference. The content of the defendant's statement, of course, did indicate that he was aware of his guilt and, if the jury believed the statements had been made by

the defendant, they could not have failed to find him guilty. In that sense, every admission or confession of an accused signifies consciousness of guilt.

While we view the instruction as inappropriate, we conclude that it was superfluous and, therefore, harmless under the circumstances of this case. If the jurors believed that the defendant had made the statement implicating himself in the crime, they had no reasonable choice but to find him guilty and the consciousness of guilt instruction was simply superfluous. The defendant's claim in this regard has no constitutional dimension.

### III

The defendant claims that the state's attorney engaged in prosecutorial misconduct in three instances: (1) attempting to bring inadmissible evidence before the jury; (2) commenting upon the defendant's failure to testify; and (3) arguing facts before the jury based on evidence that the court had stricken from the record in lieu of granting a mistrial.

### A

The defendant called B as a defense witness to testify about her conversation with Quintana on March 12, 1986, the day following the crime. She testified on direct examination that Quintana had told her on the telephone that after Chrisman, the victim, left the store on Cherry Street, he got into a fight with Quintana, who stabbed the victim in self-defense. Quintana did not indicate that he was attempting to rob Chrisman or that Oliveras was involved in the fight. "[Quintana] just said he was."

On cross-examination, however, B testified that Quintana had said "it was me and Blas," the defendant, who "did it," referring to the incident on Cherry Street. When the prosecutor inquired about conversations B

had with Quintana after March 12, defense counsel objected that the question went beyond the scope of the direct examination. The court overruled the objection. No exception to the ruling was taken. B testified that Quintana had told her of another conversation with the defendant, who had mentioned detectives coming to his house to confront him with his hat. In response to the question "With whose hat?" B responded: "With Blas's hat. And, they confronted him, is that your hat, your honor. And, they were asking him questions about the murder and stuff like that. And, they had asked Blas to take a lie detector test."

At this point the defendant asked that the jury be excused and moved for a mistrial because of the mention of a lie detector test by B. The court denied the motion for mistrial, instructed the prosecutor not to inquire concerning any conversations except those of March 11 and 12, to which the direct examination had been limited, and instructed the jurors that the testimony of B about later conversations with Quintana during cross-examination had been stricken and that they should disregard such testimony.

We see little basis for the defendant's claim of prosecutorial misconduct based upon this episode. The response of B concerning the lie detector test was not solicited by the prosecutor and was wholly unresponsive to the question. The trial court took appropriate measures to remove whatever prejudice that remark may have induced. The record does not support the claim of the defendant that the prosecutor deliberately attempted to elicit inadmissible hearsay evidence outside the scope of the testimony on direct examination by the defendant. The defendant's objection that the questions went beyond the scope of direct examination had been overruled. The response of B on direct examination that Quintana had said that he alone was

involved in the stabbing of the victim, at least arguably, justified further inquiry into that subject in order not to leave the jury with a false impression.

## B

During his closing argument the prosecutor referred to the fact that the defendant, when confronted by the police with the hat found at the scene of the crime, had given a sample of his hair but had denied that the hat belonged to him. The argument continued: "And we know that is not true. The people have no interest in lying. [V] and [B] tell us that is his hat. The person with the most interest in lying about that hat, the defendant Blas Oliveras, denied it was his, Why, if he was so innocently out there on Cherry Street on March 11th, as the attorney claims, why wouldn't he say: yes, that is my hat, it dropped while I was out there, but I didn't do anything, Quintana did it all. The only living people . . . ."

At this point the defendant objected: "That is a comment on the defendant's failure to testify." The court sustained the objection, stating: "He has an absolute right to remain silent." Later, in charging the jury, the court instructed, in accordance with General Statutes § 54-84 (b), that no unfavorable inference could be drawn from the failure of the defendant to testify.

Although the trial judge may have viewed the remarks of the state's attorney as a comment on the failure of the defendant to testify, his mention of the "absolute right to remain silent" may instead have indicated concern over the argument of the prosecutor about the failure of the defendant to admit his ownership of the hat to the police when he was questioned about it. In any event, we conclude that the prosecutor's remarks must reasonably be constructed, in the context of the entire argument, as relating to the time when the defendant denied ownership of the hat shown

to him by the police and not to his failure to testify at trial. The jury could not reasonably have regarded this comment as relating to the defendant's failure to testify. It was a permissible argument that the failure of the defendant to admit that he owned the hat shown to him, which other witnesses testified he customarily wore, was conduct inconsistent with a claim of innocence, if the jury should conclude that the hat was his and that he was present at the scene of the crime. *State* v. *Banks,* supra, 621–22.

## C

In another part of his closing argument, the prosecutor, in referring to B's testimony concerning her conversation with Quintana, remarked: "And, he puts himself and Blas Oliveras there on Cherry Street on March 11th. And, the evidence supplies the rest of the proof. It proves that Quintana and Oliveras did it. *They remained in touch the week after the murder and they talked to each other about the evidence found at the scene, the hat and the cigarette case.*" (Emphasis added.) The defendant claims that the italicized sentence was improper because the evidence on which it was based was stricken by the court as beyond the scope of the direct examination of B. No objection, however, was raised to this remark at trial.

The state concedes that the reference to the stricken evidence was improper, but contends that it was harmless. We agree. The absence of any objection by the defendant indicates that he did not view the remark as prejudicial. The remark did not relate to any significant issue in the case. Without condoning the prosecutor's conduct the principal focus of our inquiry, in the absence of egregious prosecutorial misconduct, is not the culpability of the state but the overall fairness of the trial. *State* v. *Magnotti,* 198 Conn. 209, 215, 502 A.2d 404 (1985). We conclude that the reference by the

state's attorney to facts not properly in evidence, although improper, did not affect the fairness of the defendant's trial because it could not possibly have affected the verdict.

There is no error.

In this opinion the other justices concurred.