STATE OF CONNECTICUT *v.* GREGORY MCARTHUR
(AC 26742)

Gruendel, Harper and Peters, Js.

Argued March 27—officially released June 20, 2006

*Pamela S. Nagy,* special public defender, for the appellant (defendant).

*James A. Killen,* senior assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Gary W. Nicholson,* senior assistant state's attorney, for the appellee (state).

*Opinion*

PETERS, J. Concern about the trustworthiness of confessions of criminal misconduct has led to the enunciation of the corpus delicti rule, pursuant to which a

criminal conviction cannot be based only on an uncorroborated extrajudicial confession of guilt. *State* v. *Farnum*, 275 Conn. 26, 33, 878 A.2d 1095 (2005). In this case, the defendant confessed to conduct implicating himself in the abduction and death of a victim to whose skeletal remains he led the police. The principal issue on appeal is the sufficiency of the corroborative evidence to sustain the defendant's conviction of manslaughter in the first degree, felony murder, kidnapping in the first degree and larceny in the third degree. We affirm the judgment of the trial court.

In a five count information, the state charged the defendant with capital felony in violation of General Statutes § 53a-54b (5), murder in violation of General Statutes § 53a-54a, felony murder in violation of General Statutes § 53a-54c, kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A) and (B), and robbery in the first degree in violation of General Statutes § 53a-134 (a) (1). The jury found the defendant guilty of felony murder and kidnapping in the first degree as charged. The jury found the defendant not guilty of the capital felony, murder and robbery charges, but found him guilty of the lesser included offenses of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1) and larceny in the third degree in violation of General Statutes § 53a-124 (a) (1). The trial court accepted the verdict and sentenced the defendant to a total effective term of sixty years, to be served consecutive to the sentence he was serving in Massachusetts.

Considering the record as a whole, including the defendant's confessions, the jury reasonably could have found the following facts. At about 10:30 p.m. on Friday, January 2, 1998, the defendant called an escort service owned by Gabriel Gladstone. He asked for an escort and gave Gladstone his telephone number and his

address, 550 Prospect Avenue, apartment nine, in Hartford. Gladstone gave this information to Ann Marie Cusano, a part-time employee of the service, but discouraged her from setting up an appointment. Cusano disregarded Gladstone's admonition and called the defendant shortly before 11 p.m. Cusano and the defendant arranged an appointment for that evening, and she called Gladstone and informed him that she was going to Hartford to meet with the defendant.

Before Cusano arrived, the defendant went into the north end of Hartford in search of narcotics. He was stabbed multiple times by a drug dealer from whom he attempted to steal drugs. At some time around midnight, the defendant, still bleeding from his injuries, appeared on the porch of the Magnolia Street home of Victor Alvarado and his wife in Hartford.[1] Declining the suggestion that an ambulance be called to take him to a hospital, the defendant was cared for by the Alvarados and then driven to Prospect Avenue as he requested.

Cusano drove herself to the defendant's apartment, arriving shortly before 1 a.m., on January 3. After arriving, she telephoned Gladstone from inside the defendant's apartment to notify him that she was not keeping the appointment and that she was going home. That was the last time Gladstone heard from Cusano.

When Cusano informed the defendant that she wanted to leave his apartment, he was standing between her and the door. The defendant, however, wanted Cusano to stay. A physical struggle ensued, which lasted for about five to ten minutes. The defendant eventually succeeded in preventing her from leaving, by grabbing her leg and then placing her in a headlock. He held her there until she stopped breathing. The defendant

---

[1] On January 11, 1998, Victor Alvarado told the police what had happened, after having seen a photograph of the defendant on a news program.

carried Cusano's body downstairs and placed it in her car. He drove to Suffield and disposed of her body.

Driving Cusano's car into the north end of Hartford later on January 3, the defendant approached a drug dealer named Darryl Wilson. In exchange for $50 worth of cocaine, the defendant "rented" Cusano's car to Wilson and another drug dealer named Corey Brown. Wilson and Brown dropped the defendant off at a "crack house," with the understanding that they would pick him up the following morning. When they returned for him the next morning, however, the defendant was not there. Brown initially kept the car but subsequently gave it to Wilson, who abandoned it on Pliny Street in Hartford after learning from a news program that it was linked to a missing person.[2]

Some time after having traded Cusano's car for cocaine, the defendant appeared at the home of his cousin Barbara Shannon and her husband Craig Shannon on Mansfield Avenue in Hartford. The defendant told Craig Shannon that he had been in a fight in a nearby housing project. His clothes were disheveled. The Shannons helped the defendant clean his injuries and offered to call him an ambulance, which he refused. After a few days, they asked him to leave, and he went to the West Hartford house of his aunt, Margaret Cappella. While there, the defendant asked his aunt and her daughter to clean out his Prospect Avenue apartment. He then fled to Massachusetts.

In the meantime, Cusano's daughters had become concerned about their mother's absence. On January 2, 1998, they had been staying with friends in Waterbury. When Cusano failed to pick them up, as planned, on

---

[2] Subsequently, the Hartford police recovered the car. A search of the car, pursuant to a warrant, revealed that there was no blood in the car.

the following day, they called their uncle and went with him to the Shelton police station to file a missing person's report.

Telephone records for Cusano's home led the police to Gladstone, who informed the police of her appointment with the defendant. The Shelton police then went to the defendant's apartment, where they found the apartment door ajar and observed a chair, a bed and a bag of clothes with brownish red stains. Concluding that the apartment was a possible crime scene, they summoned the Hartford police. A subsequent search of the apartment, pursuant to a warrant, revealed blood stains on the walls, mattress and chair. Also found was a bag of bloody and punctured clothing. Although there was no evidence of Cusano's blood or DNA in the defendant's apartment, under the bed the police found a gold hoop earring that was similar to one owned by Cusano.

The Hartford police traced the defendant to Massachusetts, where he had been arrested and was incarcerated for other crimes. Hartford police Detective James Rovella spoke to the defendant there on August 24, 1998, but the defendant was not brought back to Hartford pursuant to a detainer until September 1, 2000.

Upon his return to Hartford, the defendant was given *Miranda* warnings[3] and was interviewed by Rovella, Inspector Gary Mazzone and Detective Ben Trabka. He gave them four different accounts of what happened on the evening of January 2 and early morning of January 3, 1998.

In the first account, the defendant explained that, after Cusano arrived at his apartment, they went into the city to buy narcotics. One of the two drug dealers they approached, however, attacked the defendant, and

---

[3] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

the defendant blacked out. The last time that he saw Cusano, he said, she was in her car with the two dealers.[4]

In the second, third, and fourth accounts, the defendant confessed to having strangled Cusano to death in his apartment.[5] To prevent her from leaving, he placed his arm around her in a headlock in which he held her until she stopped breathing. He disposed of her body by putting it in her car and driving to Suffield. Thereafter, he traded the use of her car for cocaine.

The defendant twice accompanied the police to Suffield to show them where the victim's body was located. Although the first search in an area off 666 Boston Neck Road was unsuccessful, a second search brought Detective Michael Sheldon to a vegetated area where he found a skull. The skull and other skeletal remains found on the scene were subsequently identified as belonging to Cusano. The report issued by the office of the chief medical examiner identified the cause of death as "homicidal violence, type undetermined." At trial, the medical examiner testified that the remains recovered were consistent with someone who had been killed by strangulation.

The defendant has raised three major issues on appeal. He challenges (1) the sufficiency of the evidence to support each of the crimes of which he was convicted, (2) the court's restriction of his closing argument to the jury with respect to one of the drug dealers and (3) the court's instructions to the jury on kidnapping

---

[4] At trial, the defendant gave a similar account of the evening's events, with one major distinction. He testified that, after having been attacked by the drug dealer, he himself had been placed in the trunk of Cusano's car. When the trunk was opened, he was dropped to the ground. He then saw the taillights of the car as it was leaving and discovered that he was lying on top of the victim, who was not breathing. He walked to the road, where he was picked up by the driver of a passing truck and driven back to Hartford.

[5] With the defendant's consent, his final confession was audiotaped. The jury heard the tape and was given a transcript of its contents.

and on avoiding juror deadlock. We are not persuaded by any of these claims of impropriety.

## I

## SUFFICIENCY OF THE EVIDENCE

We first address the defendant's claim that the there was insufficient evidence to support his conviction. The defendant's argument is twofold. First, the defendant argues that the state failed to prove the corpus delicti of these crimes because the only evidence of their occurrence came from the defendant's allegedly uncorroborated confessions. Second, the defendant claims that the state failed to prove the essential elements of each crime beyond a reasonable doubt. We are not persuaded.

Our review of claims challenging the sufficiency of the evidence is governed by a two part test. "First, we construe the evidence in the light most favorable to sustaining the [decision]. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the [fact finder] if there is sufficient evidence to support the [decision]." (Internal quotation marks omitted.) *State* v. *Elsey*, 81 Conn. App. 738, 744, 841 A.2d 714, cert. denied, 269 Conn. 901, 852 A.2d 733 (2004).

## A

The defendant's principal claim is that his conviction must be set aside because, in his view, for each crime, the state's case was based solely on his uncorroborated confessions and thus failed to comply with the rule of corpus delicti. This is his only attack on the probative value of these confessions. He does not deny that the

police gave him the constitutional warnings required by *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and he does not argue that his confessions were involuntary. He maintains instead that the state failed to present substantial, independent evidence that indicated that his confessions were true. We disagree.

Historically, the corpus delicti rule prohibited a defendant from being convicted of a crime on the basis of his extrajudicial confession unless the confession was corroborated by some evidence of the corpus delicti, or "the body of the crime . . . ." See 1 W. LaFave, Substantive Criminal Law (2d 2003) § 1.4 (b), p. 29. In its original form, the corpus delicti doctrine required proof from another source that a crime had in fact occurred. See *State* v. *Tillman*, 152 Conn. 15, 18, 202 A.2d 494 (1964).

Over the last fifty years, however, the nature and extent of the corroboration requirement has evolved. Following the decision of the United States Supreme Court in *Opper* v. *United States*, 348 U.S. 84, 75 S. Ct. 158, 99 L. Ed. 101 (1954), a number of jurisdictions have abandoned the traditional rule in favor of the trustworthiness doctrine, which emphasizes the reliability of the defendant's confession rather than the availability of independent evidence of the corpus delicti. Under the trustworthiness doctrine, direct proof of the corpus delicti independent of the defendant's statements is not required as long as there is "substantial independent evidence which would tend to establish the trustworthiness of the [defendant's] statement." Id., 93. "If . . . there is substantial extrinsic evidence tending to demonstrate that the statements of the accused are 'true,' i.e., trustworty, the statements are admissible. . . . The corpus delicti of the crime may then be established by the statements of the accused and extrinsic evidence

considered together." (Citation omitted.) *State* v. *Harris*, 215 Conn. 189, 195, 575 A.2d 223 (1990). Our Supreme Court adopted the trustworthiness doctrine in *State* v. *Hafford*, 252 Conn. 274, 317, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000). See also *State* v. *Harris*, supra, 195.

Before we can address the merits of the corpus delicti claim raised by the defendant in this case, we must determine whether the claim is properly before us. Concededly, the defendant did not preserve it in the trial court.[6] We nonetheless can address his claim if it qualifies for appellate review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

In *Golding*, the Supreme Court set forth the conditions under which a defendant can prevail on an unpreserved claim of constitutional violation. Id., 239–40. "[A] defendant can prevail . . . only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id. "The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." *State* v. *George B.*, 258 Conn. 779, 784, 785 A.2d 573 (2001).

The state argues that the defendant's claim is not eligible for *Golding* review because of *State* v. *Uretek*,

[6] The defendant filed motions for a judgment of acquittal alleging insufficiency of the evidence at the end of the state's case, after the close of all the evidence and just prior to sentencing. He did not, however, cite the corpus delicti rule as the basis for his motions.

*Inc.*, 207 Conn. 706, 713, 543 A.2d 709 (1988). In *Ureteck*, our Supreme Court "summarily rejected a claim that the lack of extrinsic corroboration of an admission that was vital to proving an element of the offense implicated a fundamental constitutional right and, therefore, concluded that such a claim did not qualify for review under [the pre-*Golding* standard for review of unpreserved constitutional claims]." *State* v. *Oliveras*, 210 Conn. 751, 756, 557 A.2d 534 (1989). In *State* v. *Oliveras*, supra, 757, however, the court retreated from this holding by stating: "We need not now decide whether a claim that there was no proof of the corpus delicti, as we have defined it, from evidence independent of the confession or admission of an accused would warrant review under [the pre-*Golding* standard] as implicating a constitutional right." For present purposes, we will assume, therefore, that the defendant's claim is constitutional in nature and reviewable.

Turning to the merits of the defendant's claim, we are persuaded that the defendant cannot prevail. Undoubtedly, the state used the defendant's confessions to prove his guilt of the crimes of which he was convicted. The state's case, however, was buttressed by other evidence as well.

The principal corroborating evidence on which the state properly relied was that the defendant led the police to the place in Suffield where Cusano's skeletal remains were found. In addition, it is significant that the medical examiner testified that the cause of Cusano's death was homicidal violence and that her remains were consistent with those of someone who had been killed by strangulation. Furthermore, Victor Alvarado's testimony and the blood found in the defendant's apartment corroborate the defendant's account of his having been stabbed. The recovery of Cusano's earring on the floor of the apartment is consistent with the occurrence of a struggle in the apartment. Gladstone's testimony and

his telephone records provide additional independent evidence of the events leading to Cusano's death. Likewise, the testimony of Wilson and Craig Shannon supports the defendant's statements regarding the events following the disposal of Cusano's body. Finally, the defendant's flight to Massachusetts shortly after his appointment with Cusano and his efforts to conceal his identity demonstrate consciousness of guilt.

We conclude, therefore, that the defendant cannot prevail in his claim that the state failed to establish the corpus delicti in this case. The independent evidence adduced by the state was more than sufficient to corroborate the defendant's confessions.

### B

The defendant maintained that even if his confessions were sufficiently corroborated so that the jury could find them trustworthy, the state did not present sufficient evidence to sustain his conviction of first degree kidnapping. We disagree.

The fourth count of the information charged the defendant with having committed kidnapping in the first degree in violation of § 53a-92 (a) (2) (A) and (B) in that he "abducted Ann Marie Cusano and restrained her with intent to inflict physical injury upon her and to accomplish or advance the commission of a felony . . . ." The jury so found. According to the defendant, the state did not introduce sufficient evidence to prove abduction, restraint or the requisite intent.

The jury reasonably could have found credible the testimony of Rovello describing the statements that the defendant made in his third and fourth confessions. Through Rovello, the jury heard that, although Cusano had come to the defendant's apartment voluntarily, she thereafter decided that she wanted to leave. The defendant, who was standing between her and the door,

wanted her to stay. They fought for about five to ten minutes. To prevent her from leaving, he took her by the leg and placed his arm around her neck in a head-lock. He released her only when he noticed that she had stopped breathing.

The defendant first argues that this evidence was insufficient to establish that he had so substantially interfered with Cusano's liberty that he reasonably could have been found to have abducted and restrained her. We disagree. Even though Cusano's death by strangulation could have occurred almost instantaneously, the defendant's prior conduct in preventing Cusano from leaving was sufficiently protracted so that the jury could find as it did. Our Supreme Court recently observed that "common notions regarding the crime of kidnapping envisage the carrying away of a person under coercion and restraint. Although this type of movement undoubtedly can serve as the basis for kidnapping, our kidnapping statute does not require such movement. Rather, all that is required under the statute is that the defendant have abducted the victim . . . . [T]he abduction requirement is satisfied when the defendant restrains the victim with the intent to prevent her liberation through the use of physical force. Further, the victim is restrained when the defendant . . . moves her from one place to another *or* restricts her movement by confining her in the place where the restriction commenced. . . . [W]e read the language of the statute as allowing the restriction of movement alone to serve as the basis for kidnapping. Therefore, the relevant inquiry under our kidnapping statute is whether any movement, or restriction of movement, was accomplished with the intent to prevent the victim's liberation. . . . [A]ny argument imputing a temporal requirement . . . for abduction under the kidnapping statute must fail." (Citations omitted; emphasis in original.) *State* v. *Luurtsema*, 262 Conn. 179, 201–202, 811 A.2d 223 (2002).

Alternatively, the defendant argues that the state failed to introduce evidence that he restrained Cusano with the intent to inflict physical injury on her. We agree, however, with the state that the jury had the right to infer from the manner in which the defendant stopped Cusano from leaving that he intended a physical assault on her body even if he did not anticipate that his headlock would result in her asphyxiation. We know of no authorities requiring more of a showing than this.

### C

In the second count of the information, the state charged the defendant with having committed murder in violation of § 53a-54a. Although the jury found him not guilty of that crime, it found him guilty of the lesser included offense of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1). The defendant maintains that the evidence at trial was insufficient to sustain this conviction because the state failed to prove (1) that he intended to cause serious physical injury to Cusano and (2) causation.

Concededly, the first of these claims mirrors the claim about lack of intent that the defendant has raised with respect to his conviction of kidnapping. We need not repeat here why that claim is unpersuasive.

The defendant next argues that the state did not prove that he caused Cusano's death because the medical examiner testified that he "found no evidence of the injuries that caused her death from the examination of the portions of the skeleton that we found." He also testified that, although he had listed homicidal violence as the cause of death in his autopsy report, he could not rule out causes of death other than strangulation. The five cervical vertebrae that were recovered did not provide evidence of a neck fracture.

The defendant recites the medical examiner's testimony as if it should be read without regard to his confession about the manner in which he restrained Cusano to prevent her from leaving his apartment. We agree with the state that, in its entirety, the evidence established that, in holding her in a headlock, he not only intended to cause Cusano to suffer serious physical injury but did in fact cause her to die.

### D

In the fifth count of the information, the state charged the defendant with having committed robbery in violation of § 53a-134 (a) (1). Although the jury found him not guilty of that charge, it found him guilty of the lesser included offense of larceny in the third degree in violation of § 53a-124 (a) (1) for having taken a motor vehicle, "the value of which is five thousand dollars or less . . . ." The state's claim was that the defendant committed this crime by "renting" Cusano's car to a drug dealer in exchange for cocaine.

The defendant maintains that the evidence on this charge was insufficient because the state introduced no evidence about the value of the car. Indeed, the trial court told the jury: "[Y]ou've had no evidence of value that I can recall. So, $5000 or less. If it was worth a penny, it's an amount less than $5000. And so that element of the crime is before you." According to the defendant, because it is impossible to know whether the car was worth $100 or $10,000, the defendant's larceny conviction must be vacated.

The defendant cannot prevail on this argument. Even if the car was worth only $100, the valuation requirement of the statute would have been satisfied. Moreover, if the jury found credible the defendant's statement that he was able to drive the car, the jury had a basis for finding that it had some cognizable value.

## E

In the third count of the information, the state charged the defendant with having committed felony murder in violation of § 53a-54c. Although the jury found the defendant not guilty of the predicate felony of robbery, the jury found him guilty of the other predicate felony of kidnapping. The defendant has raised no additional issues with respect to the sufficiency of the evidence to support that count.

## II

## CLOSING ARGUMENT

Under the sixth and fourteenth amendments to the United States constitution, a criminal defendant has a constitutionally protected right to make a closing argument. That right is violated "not only when a defendant is completely denied an opportunity to argue before the court or the jury after all the evidence has been admitted, but also when a defendant is deprived of the opportunity to raise a significant issue that is reasonably inferable from the facts in evidence." *State* v. *Arline*, 223 Conn. 52, 64, 612 A.2d 755 (1992). The defendant maintains that this right was infringed in this case because the trial court improperly precluded him from commenting on the state's failure to call Corey Brown as a witness.

The law governing comments on missing witnesses in this state underwent a substantial change in *State* v. *Malave*, 250 Conn. 722, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000). Rejecting the prior rule of *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960), our Supreme Court expressed its skepticism about the legitimacy of inferences about the availability and testimony of potential witnesses at trial. *State* v. *Malave*, supra, 734–38. It held, nonetheless, that trial counsel was "not

prohibit[ed] . . . from making appropriate comment, in closing arguments, about the absence of a particular witness, insofar as that witness' absence may reflect on the weakness of the opposing party's case . . . [s]o long as counsel does not directly exhort the jury to draw an adverse inference by virtue of the witness' absence . . . ." Id., 739. Significantly, the court noted that "the trial court retains wide latitude to permit or preclude such a comment, and may, in its discretion, allow a party to adduce additional evidence relative to the missing witness issue." Id., 740.

In this case, the defendant claims that the court improperly denied him the opportunity, in his closing argument, to argue to the jury that the state's case was weakened by its failure to call Brown as a witness for the state. As previously noted, Brown was one of two drug dealers with whom the defendant negotiated an exchange of the use of Cusano's car for a quantity of cocaine. The defendant claims that the court's ruling deprived him of his federal and state constitutional rights to effective assistance of counsel, to present summation to the jury and to present a defense.

The other drug dealer with whom the defendant negotiated for this cocaine was Darryl Wilson, who testified at trial. According to Wilson, some time in the late evening into early morning of January 3-4, 1998, he and the defendant drove to the home of Brown so that the defendant could buy some cocaine. The three made a deal in which the defendant obtained $50 worth of cocaine in exchange for Wilson's and Brown's use of the car. Wilson and Brown agreed to meet the defendant to return the car the following morning, but the defendant did not show up at the designated place. Although Brown kept the car initially, he subsequently gave it to Wilson, who abandoned it upon discovering that it belonged to Cusano and recognizing the defendant as a person for whom the police were looking in connection with her disappearance.

Neither the state nor the defendant called Brown to testify as a witness. Relying on the testimony of an inspector for the office of the chief state's attorney that, despite the assistance of the Hartford police department, Brown could not be located, the state maintained that Brown was not an available witness. The defendant, however, produced the testimony of an investigator for the public defender's office, who reported that Brown had appeared in the public defender's office in response to a subpoena left at the address of Brown's mother. Concededly, the public defender's office did not inform the state that Brown had been located and did not tell Brown that the police were looking for him.

On this record, the defendant sought to inform the jury that Brown was available to testify, that Brown was a witness whom the state naturally would have called as a witness to the disposition of Cusano's car and that the state's failure to do so demonstrated a weakness in the state's case against the defendant. He did not, however, make a specific offer of proof about the testimony that Brown would have given, nor did he identify the weakness in the state's case that was demonstrated by Brown's failure to testify.

As this court observed in *State* v. *Graham*, 67 Conn. App. 45, 49, 787 A.2d 11 (2001), cert. denied, 259 Conn. 911, 789 A.2d 996 (2002), "[t]he broad discretion vested in trial courts by *Malave* mirrors the general standards regarding the trial court's ability to limit closing argument. [T]he scope of final argument lies within the sound discretion of the court . . . subject to appropriate constitutional limitations. . . . It is within the discretion of the trial court to limit the scope of final argument to prevent comment on facts that are not properly in evidence, to prevent the jury from considering matters in the realm of speculation and to prevent the jury from being influenced by improper matter that might prejudice its deliberations." (Internal quotation

marks omitted.) To assist the court in its exercise of its discretion, the defendant should explain "how the state's decision not to call [the witness] exposed a weakness in the state's case" and should "make an offer of proof regarding the substance of [the witness'] potential testimony." Id. In this case, as in *Graham*, all that the defendant presented to the court was a blanket statement that Brown's failure to testify demonstrated a weakness in the state's case. See id.

Although there are exceptional cases in which appellate courts have overturned limitations on a defendant's closing argument, those cases are readily distinguishable. Unlike *State* v. *Arline*, supra, 223 Conn. 56, this case does not involve comments on evidence supporting an inference of motive or bias on the part of a complaining witness. Unlike *State* v. *Ross*, 18 Conn. App. 423, 433, 558 A.2d 1015 (1989), this case does not involve the absence of the only eyewitness to the crime.

On the present record, Brown was not a witness who could have offered any direct testimony with respect to the defendant's conviction of kidnapping, manslaughter or felony murder because he never saw Cusano and the defendant together. The defendant speculates that Brown could have described the defendant's physical condition on the morning of the crime, but the record does not indicate that the defendant ever informed the state or the trial court that Brown could have offered such evidence.

With respect to the defendant's conviction of larceny, the defendant has not suggested how Brown's testimony would have differed from that given by Wilson at trial. On the present record, there is no reason to suppose that, if Brown had testified, he would not have been impeached in much the same manner that Wilson was impeached. Like Wilson, Brown admittedly was a drug dealer. The failure to have both of them testify

about the defendant's use of Cusano's car was not a weakness justifying commentary by the defendant. See *State* v. *Cruz*, 71 Conn. App. 190, 211–12, 800 A.2d 1243, cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002).

In light of the central role that the defendant's own statements played in his conviction, we are persuaded that the court's restriction of commentary on the state's failure to call Brown as a witness did not implicate the defendant's constitutional rights to a fair trial and to the effective assistance of counsel. Viewing the court's decision to exclude this commentary as an exercise of the court's discretion, we hold that the court's decision was not an abuse of that discretion.

### III

### JURY INSTRUCTIONS

The defendant's third claim for reversal of his conviction is that the court, in two different respects, misinstructed the jury with respect to the charge of kidnapping. He maintains that the court (1) improperly instructed the jury with respect to the relationship between kidnapping in the first degree and manslaughter and (2) coerced the jury into continuing to deliberate after it had announced that it could not reach a verdict on that charge. We are not persuaded.

### A

The defendant first claims that the trial court misinstructed the jury on kidnapping in response to the jury's request for a recharge on kidnapping and unlawful restraint. As charged in the information, to find the defendant guilty of kidnapping in the first degree under § 53a-92 (a) (2), the jury had to find that he had restrained another person "*with intent* to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony . . . ." (Emphasis added.) According to the

defendant, the court improperly allowed the jury to find the defendant guilty of a crime that did not exist because, in its recharge, it informed the jury that the defendant could be found guilty under § 53a-92 (a) (2) (B) for intending to commit manslaughter. Although the defendant did not object to the recharge as given, he now claims that he is entitled to a new trial on the charges of kidnapping and felony murder because manslaughter is not an intent crime. We disagree.

As always, we start our analysis with a statement of the standard of review that governs the defendant's claim. "The principal function of a jury charge is to assist the jury in applying the law correctly to the facts which [it] might find to be established . . . . When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety . . . and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party . . . . In this inquiry we focus on the substance of the charge rather than the form of what was said not only in light of the entire charge, but also within the context of the entire trial. . . . Moreover, as to unpreserved claims of constitutional error in jury instructions, we have stated that under the third prong of *Golding*, [a] defendant may prevail . . . only if . . . it is reasonably possible that the jury was misled . . . ." (Internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 864–65, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006).

The defendant does not challenge the accuracy of the trial court's initial instructions on kidnapping in the first degree, in which the court identified the aggravating factor under § 53a-92 (a) (2) subparagraph (B) as

a restraint intended to accomplish or advance the commission of robbery or murder. He maintains instead that it was improper for the court, in its recharge, to include manslaughter as one of the possible intended felonies on which the jury could rely.[7] According to the defendant, because the death implicated by manslaughter is, by definition, unintentional, manslaughter is not a permissible aggravating factor under the kidnapping statute. He claims, therefore, that he is entitled to a new trial.

The state's first response to this claim is that, if the instruction was improper, the court's error was harmless. It maintains that the jury had no reason to reach the issue of the scope of § 53a-92 (a) (2) (B) because it "necessarily found that the defendant abducted and restrained the victim with the intent to inflict serious injury" under § 53a-92a (a) (2) (A). In the court's inquiry about the jury's verdict on the charge of kidnapping, the court did not distinguish between subparagraphs (A) and (B). Concededly, the defendant voiced no objection to the court's failure to ask the jury to make separate findings with respect to each subparagraph.

We are not persuaded by the state's harmless error claim. In the cases on which the state relies, the factual

[7] In its recharge, the court instructed the jury as follows: "Now, since you've asked me about manslaughter, there are some situations where kidnapping in the first degree can be for the purpose of advancing the commission of the felony of manslaughter, but not always.

"Only manslaughter with intent to inflict serious physical injury is a manslaughter that would qualify for this element of kidnapping in the first degree because kidnapping is an intentional crime, and it is possible to kidnap with the intent to further a death committed in the course of intending to commit serious physical injury.

"But it is not possible to have a kidnapping in the first degree intentionally designed to commit a reckless manslaughter. One cannot intend to do something reckless. Well, one can intend to do something foolishly, recklessly, but one cannot intend under our law.

"So, only manslaughter [subdivision] (1), the physical injury, is eligible for one of the felonies that is the required element of kidnapping in the first degree."

basis for the defendant's conviction necessarily included a jury finding of the element on which the trial court failed to give a proper jury instruction. See *State* v. *Padua*, 273 Conn. 138, 167–71, 869 A.2d 192 (2005) (proximity of apartment where marijuana was found to public housing project); *State* v. *Montgomery*, 254 Conn. 694, 735–38, 759 A.2d 995 (2000) (use of firearm in commission of murder). Here, by contrast, the defendant consistently contested the intentional nature of his conduct.

We agree with the state, however, that the defendant's constitutional right to a fair trial was not violated by the trial court's recharge on kidnapping because it could not have misled the jury. The court was careful to limit the jury's consideration of manslaughter as an aggravant of intentional restraint to conduct manifesting an *intent* to inflict serious physical injury. Expressly excluding reckless misconduct from the jury's deliberations on kidnapping, the court properly focused the jury's attention on the defendant's mental state rather than on the result of the defendant's conduct. The court's instruction thus mirrored instructions on accessorial liability that have been found to be proper both by our Supreme Court in *State* v. *Foster*, 202 Conn. 520, 533, 522 A.2d 277 (1987), and this court in *State* v. *Harris*, 49 Conn. App. 121, 127–29, 714 A.2d 12 (1998).

## B

The defendant's final claim is that the trial court denied his rights to due process, to a fair and impartial trial and to a unanimous verdict free of coercion because of the manner in which the court instructed the jury to attempt to reach a unanimous verdict on the charge of kidnapping. Concededly, the court followed the language of the Chip Smith charge[8] as

---

[8] "The purpose of the [Chip Smith] instruction is to prevent a hung jury by urging the jurors to attempt to reach agreement. It is a settled part of Connecticut jurisprudence. . . . D. Borden & L. Orland, 5 Connecticut Practice Series: Connecticut Criminal Jury Instructions (2d Ed. 1997) § 4.4, p.

restated recently by our Supreme Court in *State* v. *O'Neil*, 261 Conn. 49, 60 n.16, 801 A.2d 730 (2002). The defendant maintains, however, that his federal and state constitutional rights were violated by the court's addition of a coercive prefatory instruction. We disagree.

The jury began its deliberations on December 3, 2002, and deliberated further on December 4, 5, 10, 11, 12 and 13 before reaching a verdict. During its deliberations, the jury asked the trial court for reinstruction on fifteen occasions. On December 11, the jury sent the court a note stating: "We cannot come to a consensus on the kidnapping charge. Please help us to understand our options."

In response to this inquiry, the court informed both counsel that it would give the jury the standard Chip Smith charge. The defendant's only comment was that it was premature to do so. The court decided, however, that it was timely to do so because the jury already had been deliberating for four days.

Before giving the Chip Smith instructions to the jury, the court stated: "Keep in mind how important it is for you to reach unanimous agreement, because if you can't agree, then the case as to the charge that you can't agree on is mistried and the case has to be tried again. There's no particular reason to believe that the next

245. Better than any other statement . . . it makes clear the necessity, on the one hand, of unanimity among the jurors in any verdict, and on the other hand the duty of careful consideration by each juror of the views and opinions of each of his fellow jurors . . . ." (Internal quotation marks omitted.) *State* v. *Feliciano*, 256 Conn. 429, 439, 778 A.2d 812 (2001). "It is the language used and not the number of times a Chip Smith charge is given that determines whether the instruction is improper. If the words are not coercive, then the fact that they are uttered more than once does not change their character." Id., 441. The standard language contains the admonition that the trial court is not compelling the jury to reach a verdict. The second half of the instructions merely explains the deliberative process to the jury. Id.

twelve of you will be any more conscientious and impartial than you are." It then urged the jurors, in standard Chip Smith language, that, although they should not merely acquiesce in the conclusion of their fellow jurors, they should carefully respect and listen to each other's opinions with an open mind. Although asked to comment, the defendant did not object further except to reiterate his view that the charge should not have been given at all.

In his appeal, the defendant challenges only the court's prefatory comments. In his view, it was coercive, and hence constitutionally impermissible, for the trial court to mention the possibility of a mistrial to the jury. He relies on *State* v. *O'Neill*, 200 Conn. 268, 511 A.2d 321 (1986), in which our Supreme Court upheld the giving of a Chip Smith instruction by noting what the trial court in that case had *not* said. "The potential of a mistrial, upon a deadlock, often regarded as coercive, was fully absent in this charge. . . . Because the possibility of disagreement by a jury and the consequent lack of a unanimous verdict 'is a protection conferred upon a criminal defendant in a criminal case by the [United States] constitution,' for a judge to tell a jury that a case must be decided is not only coercive in nature but is also misleading in fact because to do so precludes the right of a defendant to rely on the possibility of a disagreement by the jury." (Citation omitted.) Id., 284.

We agree with the defendant that the trial court should not have given the prefatory instruction that it did. To date, our Supreme Court has declined to interpolate into the standard Chip Smith charge a reference to the undesirability of a possible retrial in the event of juror disagreement. See *State* v. *O'Neil*, supra, 261 Conn. 74–75; compare *State* v. *O'Neil*, supra, 261 Conn. 83 n.2 (*Borden, J.*, concurring). Furthermore, the disapproval of such a charge in *State* v. *O'Neill*, supra,

200 Conn. 268, does not stand alone. For similar expressions of concern, see *State* v. *Colon*, 28 Conn. App. 231, 246, 611 A.2d 902, cert. denied, 223 Conn. 922, 614 A.2d 827 (1992); see also *United States* v. *McElhiney*, 275 F.3d 928, 945 (10th Cir. 2001); *United States* v. *Harris*, 391 F.2d 348, 355 (6th Cir.), cert. denied, 393 U.S. 874, 89 S. Ct. 169, 21 L. Ed. 2d 145 (1968); *Stapleton* v. *State*, 696 P.2d 180, 183 (Ala. App. 1985); *People* v. *Barraza*, 23 Cal. 3d 675, 682–83, 591 P.2d 947, 153 Cal. Rptr. 459 (1979); *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 100 n.16, 300 N.E.2d 192 (1973); *State* v. *Quint*, 448 A.2d 1353, 1356 (Me. 1982).

The question remains, however, whether the court's embellishment of the Chip Smith charge requires a new trial. The state urges us to conclude that the court's error was harmless because (1) the defendant did not take specific exception to the prefatory language, (2) the court's subsequent accurate recital of the Chip Smith charge furnishes sufficient assurance that the jury was not misled and (3) the jury continued to deliberate for a considerable period of time subsequent to the court's charge.

In light of *State* v. *O'Neil*, supra, 261 Conn. 49, the state cannot prevail on its claim that the defendant's failure to object to the court's prefatory charge is fatal to his claim on appeal. While the defendant's appellate brief does not expressly refer to *State* v. *Golding*, supra, 213 Conn. 239–40, with respect to this issue, he properly characterizes his disagreement with the court's charge as implicating his constitutional rights to due process, to a fair and impartial trial and to a unanimous jury verdict free of coercion. In *O'Neil*, the court acknowledged that a claim "that the Chip Smith instruction coerced minority view members of the jury is of constitutional magnitude." *State* v. *O'Neil*, supra, 59.

The state is, however, on stronger ground, when it urges us to consider whether the coercive aspect of the court's prefatory instructions was attenuated by the court's accurate recital of the rest of the Chip Smith charge[9] as restated in *State* v. *O'Neil*, supra, 261 Conn. 74–75. The court's final instructions were designed to encourage each juror to act independently. "Do not ever change your mind just because other jurors see things differently or to get the case over with," the court told the jury. "As I told you before, in the end, your vote must be exactly that, your own vote. As important as it is for you to reach a unanimous agreement, it is just as important that you do so honestly and in good conscience. . . . [W]hat I have said to you is not intended to rush you into agreeing on a verdict. Take as much time as you need to discuss the matter. There is no need to hurry." We have often recognized that accurate final instructions can serve to cure even constitutional defects in earlier proceedings. See, e.g., *State* v. *Alston*, 272 Conn. 432, 450, 862 A.2d 817 (2005); *State* v. *Yusuf*, 70 Conn. App. 594, 630, 800 A.2d 590, cert.

---

[9] The court told the jury that "the verdict that each of you agrees [to] must express your own conclusion and not merely acquiesce in the conclusion of your fellow jurors. But, in order to bring your minds to a unanimous result, you should consider the question you have to decide not only carefully, but with due regard and deference to the opinions of each other. In conferring together, pay proper respect to each other's opinions and listen with an open mind to each other's arguments. If the much greater number of you reach a certain conclusion, dissenting jurors should consider whether their opinion is a reasonable one or the evidence does lend itself to assume a result in the minds of so many of you who are equally honest and equally intelligent, who have heard the same evidence with an equal desire to arrive at the truth and under the sanctions of the same oath. But please remember this. Do not ever change your mind just because other jurors see things differently or to get the case over with. As I told you before, in the end, your vote must be exactly that, your own vote. As important as it is for you to reach a unanimous agreement, it is just as important that you do so honestly and in good conscience. . . .

"[W]hat I have said to you is not intended to rush you into agreeing on a verdict. Take as much time as you need to discuss the matter. There is no need to hurry."

denied, 261 Conn. 921, 806 A.2d 1064 (2002). Furthermore, the fact that the jury did not announce its verdict immediately upon its resumption of deliberations the following day is some evidence that the court's final cautionary words were taken seriously.

### CONCLUSION

In summary, we conclude that the defendant's conviction should be upheld. The defendant's confessions were corroborated sufficiently by independent evidence to sustain the jury's verdict with respect to manslaughter, felony murder, kidnapping and larceny. The court did not abuse its discretion in its limitation on the defendant's closing comments to the jury. The court's instructions on kidnapping were proper and its Chip Smith instruction was not reversible error.

The judgment is affirmed.

In this opinion the other judges concurred.