******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MARLANDO DALEY
(AC 37580)

Sheldon, Keller and Sullivan, Js.

*Argued September 11—officially released December 22, 2015*

(Appeal from Superior Court, judicial district of
Fairfield, Thim, J.)

*Pamela S. Nagy*, assistant public defender, for the
appellant (defendant).

*Adam E. Mattei*, assistant state's attorney, with
whom, on the brief, were *John C. Smriga*, state's attorney, and *Joseph T. Corradino*, senior assistant state's
attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Marlando Daley, appeals from his October 17, 2011, conviction of murder in violation of General Statutes § 53a-54a (a), in connection with the shooting death of Roland McLennon on Edna Avenue in Bridgeport on July 4, 2010. After the defendant was found guilty of that offense by a jury in the Bridgeport Superior Court, he was sentenced by the court, *Thim, J.*, to a term of forty years imprisonment.

In this appeal, the defendant makes two claims of error: (1) that the trial court coerced the jury into rendering a verdict, in violation of his state and federal constitutional right to a fair trial, by informing the jury that the case would be mistried if it could not reach a unanimous verdict; and (2) that the trial court improperly refused to admit evidence of a recorded statement by a Bridgeport police officer to his dispatcher, reporting his mother's statement to him that she had almost been struck by a speeding vehicle that resembled the shooter's vehicle, but did not match the defendant's vehicle, at or about the time and place of the shooting. We affirm the judgment of the court.

The jury reached its verdict on the basis of the following evidence. On July 4, 2010, at 10:02 p.m., Officer Pasquale Speranza of the Bridgeport Police Department was dispatched to Edna Avenue to respond to a call reporting that shots had been fired in that location. Upon arriving at the scene, he found the lifeless body of a man lying in a pool of blood on the side of the street. A trail of what appeared to be blood led from the body down Edna Avenue to the corner of East Main Street. Harold Wayne Carver II, the state's chief medical examiner, testified that he conducted an autopsy of the decedent and determined that the cause of death was a single gunshot wound to the head.

After speaking with three onlookers at the scene, the police broadcasted a lookout for a dark-colored sport utility vehicle (SUV). The police also spoke with a witness who said that after she had heard gunshots, she looked out her window and saw one or two males firing at a Jeep-like vehicle. Although the police developed no suspects while conducting their on-scene investigation, they positively identified the decedent as Roland McLennon of Bridgeport, based upon information received from family members who came to the scene.

Nine months after the shooting, in early April, 2011, the police approached the decedent's brother, Byron McLennon, Jr., while he was at the office of his probation officer, to talk about his brother's death. In their ensuing conversation, Byron reported for the first time to the police that he had been an eyewitness to the shooting, having driven his brother over to Edna Avenue on that evening. Byron stated that, upon arriving on Edna Avenue, he parked his car after his brother got

out and started to walk across the street toward a black Mercedes SUV with a New York license plate. When Roland turned to Byron and waved for him to come along with him, Byron turned off the car and followed his brother. Once Roland reached the SUV, he had a short conversation with the driver, whom Byron saw and recognized through the partially open passenger side window as "Massup," a man from the local Jamaican community whom he had seen playing soccer at Seaside Park in Bridgeport and whom he knew to promote parties at local clubs. During his conversation with police, which the police recorded on video, Byron identified the defendant as "Massup" by selecting his photograph from an eight person photographic array.

Although Byron could not hear his brother's entire conversation with the defendant, he did hear his brother utter the derogatory term, "pussy hole," just before a gunshot rang out from inside the SUV. As his brother slumped to the ground by the side of the SUV, Byron saw something black in the defendant's right hand. After his brother was shot, Byron ran back to his car and drove away to his parents' house on Elmwood Avenue in Bridgeport. Upon his arrival, he told a family member that his brother had been killed, but otherwise gave no details of the shooting. Byron never approached the police to report what he had seen for fear that being at a crime scene might jeopardize his probation.

The defendant, who drove a black Mercedes SUV in July, 2010, presented an alibi defense through the testimony of his friend, David Webley, the defendant's girlfriend, Miekah McCurvin, and his acquaintance, Alicia Grant, who held a party at her house in Stratford on July 4, 2010. Through their testimony, the defendant claimed that he and Webley had attended Grant's party until 10 p.m. or 10:30 p.m. that evening before returning to the defendant's house on Huntington Avenue, where they met up with the defendant's cousin, Rosie, who was already at the house when they arrived, and his girlfriend, McCurvin, who arrived shortly thereafter. The defendant did not testify at trial. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly coerced the jury to return a verdict, in violation of his state and federal constitutional right to a fair trial, by: (1) telling the jury that if it could not reach a unanimous decision, "the case w[ould] be tried over"; and (2) telling one juror, who had asked to speak with the judge privately about her scheduling concerns, that he did not want to excuse her from the jury because "we have to have a jury of twelve to decide the case; otherwise, we have to start the whole process over. . . . [T]his case has been pending a long time, and we just don't want to start it all over again." According to the defendant, "[i]t is coercive for a judge to mention the possibility

of a mistrial if the jury does not come to a verdict."

"A jury that is coerced in its deliberations deprives the defendant of his right to a fair trial under the sixth and fourteenth amendments to the federal constitution, and article first, § 8, of the state constitution. Whether a jury [was] coerced by statements of the trial judge is to be determined by an examination of the record. . . . The question is whether in the context and under the circumstances in which the statements were made, the jury [was], actually, or even probably, misled or coerced." (Citations omitted; internal quotation marks omitted.) *State* v. *Pinder*, 250 Conn. 385, 427, 736 A.2d 857 (1999). The court must "consider [the jury instructions] from the standpoint of their effect upon the jury in the context and under the circumstances in which they were given." *State* v. *Ralls*, 167 Conn. 408, 422, 356 A.2d 147 (1974), overruled on other grounds by *State* v. *Rutan*, 194 Conn. 438, 479 A.2d 1209 (1984).

The following additional facts are relevant to this claim. On Friday, October 14, 2011, after counsel presented their closing arguments, the court gave its final instructions to the jury. In addition to instructions on the elements of the charged offense, the role of the jury, the burden of proof, and the presumption of innocence, the court gave the jury the following general instruction as to the manner in which it should conduct its deliberations: "In the jury room, you should talk with each other about the case. Each of you must make your own conscientious decision, but only after you have considered all the evidence, discussed it fully with the others, and listened to the views of the others. Each of you should consider whether your views are fair and reasonable and try your best to decide the case according to the law. Do not hesitate to reexamine your own views and to change your mind if you are persuaded that you should do so, but do not surrender your honest opinion solely because your opinion is different from the other jurors' or for the mere purpose of returning a verdict." The defendant took no exception to this instruction. In view of the late hour at which the jurors were about to start their deliberations, however, the defendant asked the court to advise the jury that there would be no restriction on the amount of time it would have to deliberate. The court obliged by giving the following additional instruction: "[T]here is no time constraint on when you must make a decision. . . . [Y]ou should take as much time as you feel is necessary to render your decision in a careful and just manner. . . . [I]t's now five of four and you should not feel that you have to render a decision . . . by quarter of five. . . . I told you the case might go over to a week or two, and we had that delay at the beginning of the week, which was beyond our control. So, we have the extra day, so, if you need more time, you have that time." Once again, no exception was taken to this charge.

After deliberating for some time thereafter, the jury asked the court to replay for it both the video recording of Byron McLennon, Jr.'s interview by the Bridgeport police and the trial testimony of the defendant's principal alibi witness, Webley. The court then excused the jury for the weekend, informing it that it would replay the requested material when court reconvened the following Monday. The following Monday morning, the court replayed the material requested by the jury. Following the playback, the jury resumed its deliberations. The jury later sent out a second note that read, simply, "Jury Instructions." The court responded to this note by orally requesting the jury to specify which instructions it wished to rehear. After the jury returned from lunch, it responded to the court's request for clarification by sending out a third note, in which it specified, "The playback of the judge's instructions to the jury, pertaining to the guidelines for arriving at a decision." By agreement with counsel, the court responded by reinstructing the jury on the procedure for selecting a foreperson, and rendering a unanimous verdict, and, in essentially identical terms as described previously, the manner in which it should conduct its deliberations.

Later that day, the jury sent out a fourth note in which it asked three more questions, which the jury phrased as follows: "(1) Can the judge reread from the piece of paper pertaining to the factors that enable the jurors to reach a verdict?; (2) What is the scope of the 'limited use', evidence as it pertains to the videos of the police interview with Byron Mclennon Jr.?; [and] (3) What happens in the event that the jury cannot come to a unanamous decision?" The court, the prosecutor, and defense counsel could not agree on what the jury meant by its first question, and so they agreed that the court should ask the jury for clarification on that subject. As for the second question, the court instructed the jury that it was to use the video recording of Byron McLennon, Jr.'s police interview only to evaluate his credibility as a witness. Finally, the court advised counsel that it would instruct the jury on the third question as follows: "And then, as far as, they can't agree—the answer to, if they can't agree, they can't agree. The case gets tried over again." After some further discussion with counsel about the meaning of the first question, the court again told counsel that it would instruct the jurors on the third question that, "if they can't come to a decision, they can't come to a decision; the case gets tried over. I'd like to talk to them before we arrive at that point— you know—in the courtroom, and that would be a Chip Smith charge." No one objected to this proposed instruction, and thus the court responded to the jury's third question as follows: "And what happens in the event that the jury cannot come to a unanimous decision? Well, that would mean that you—you would just so announce that—not—have not been able to decide the case and the case will be tried over." No exception

was taken to this instruction.

Presumably in response to the court's request for clarification as to the first question in the jury's fourth note, the jury next sent out a fifth note, asking, "What is the 'burden of proof'?" The court responded to this note by instructing the jury as to the presumption of innocence and the standard of proof beyond a reasonable doubt.

The jury then resumed its deliberations once again before sending out a sixth note, requesting the playback of Byron McLennon, Jr.'s trial testimony. When the trial judge read this note to counsel, he also informed them that one of the jurors, M.C., had asked, through the clerk of the court, for an opportunity to speak with him about scheduling concerns. The court first replayed some of the requested testimony for the jury, but stopped with about one hour of playback remaining so that it could speak with M.C. before the end of the day.

When M.C. was called out into the courtroom, she told the court, in the presence of counsel, that "[w]hen I started, I told them that after five days, it would be a hardship financially for me to continue with the case, and I had asked if they thought it was gonna go beyond five days, to put me on something else. . . . I'm supporting four people on a nurse's salary, and . . . I have a disabled daughter and it really is very difficult to support four people on $50 a day." The court demurred to M.C.'s claim of hardship, responding as follows: "Let me address this issue tomorrow morning. That means you'll have to come here tomorrow morning, and then— well, first of all, let me talk to the lawyers first. Could you just step into the jury room, please?" Once M.C. left the courtroom, the court told counsel that it did not want to excuse her because only one alternate remained and they might still need the remaining alternate to finish the trial.[1] The state agreed that M.C. should return to court the next day for completion of the playback, and that the court could address her claim of hardship at that time. Defense counsel voiced no objection to that proposal, observing only that, in light of the unfinished playback, "she's gonna lose tomorrow anyway . . . ." The court then had the juror brought back into the courtroom, where, in the absence of the other jurors, it told her, "[W]e have to have a jury of twelve to decide the case; otherwise, we have to start the whole process over. So, let's gather here tomorrow, we'll listen to the balance of the testimony, and then we'll take a little break and then—you know—I'll talk to you further, and maybe later in the morning—you know—we'll excuse you—excuse you, but you know, this case has been pending a long time and we just don't want to start it all over again." The court did not explain to the juror what it meant by the phrases, "to start the whole process over," or, "to start it all over again."[2]

The court then had the alternate juror, who had been

present for the playback, brought back into the courtroom to excuse him for the day. As it began to tell the alternate[3] that it was about to excuse the regular jurors, however, it interrupted itself to say, "Okay. The jury wants to deliberate a little bit."[4] The jury thereafter resumed its deliberations, without objection by the defendant, before sending out a seventh and final note, in which it reported that it had reached a verdict. After the jury returned its verdict of guilty, defense counsel did not request that the court poll the jury.

On October 21, 2011, the defendant filed a motion for a new trial, in which he claimed that the "court's advisement of the potential for a mistrial may have had coercive effects upon the jury's verdict." Defense counsel argued this motion prior to sentencing, at which time he characterized M.C.'s demeanor during her colloquy with the court as "fairly hostile toward the court's inquiries about her . . . ." The court denied the motion and disputed counsel's characterization of M.C., stating, "I don't recall her as having been hostile. I don't think that fairly sets forth the tone of the courtroom at the time."

Notwithstanding his failure to object or take exception to the challenged instruction at trial, the defendant now claims that he preserved this claim of error for appeal by filing his new trial motion on the ground of jury coercion arising from the court's instruction. The proper time for the defendant to preserve a claim of error with respect to the court's instructions, however, is when the court proposes to give the challenged instruction or after it gives it to the jury. See *State* v. *Whipper*, 258 Conn. 229, 244, 780 A.2d 53 (2001), overruled in part on other grounds by *State* v. *Cruz*, 269 Conn. 97, 106, 848 A.2d 445 (2004), and *State* v. *Grant*, 286 Conn. 499, 535, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008); *State* v. *Smith*, 100 Conn. App. 313, 320 n.6, 917 A.2d 1017, cert. denied, 282 Conn. 920, 925 A.2d 1102 (2007); see also *State* v. *Martinez*, 173 Conn. 541, 543, 378 A.2d 517 (1977). Accordingly, this issue was not preserved at trial.

In the alternative, the defendant requests that we review his claim of error under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). Under the rule of *Golding*, as modified in *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond

a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis omitted; footnote omitted.) *State* v. *Golding*, supra, 239–40; see also *In re Yasiel R.*, supra, 781 (modifying third prong). "The first two [*Golding*] requirements involve a determination of whether the claim is reviewable; the second two requirements involve a determination of whether the defendant may prevail." *State* v. *George B.*, 258 Conn. 779, 784, 785 A.2d 573 (2001).

The defendant here satisfies the first and second prongs of *Golding*, for the record is adequate for review of the defendant's claim, and the claim is of constitutional magnitude. See *State* v. *Pinder*, supra, 250 Conn. 427. The defendant fails, however, to satisfy the third prong of *Golding*, and thus he cannot prevail on his claim.

The defendant claims that the court erred both in telling the entire jury that the case would be "tried over" if the jury could not reach a unanimous verdict and in telling M.C., in response to her claim of hardship, that it did not wish to excuse her because the case had been pending for a long time and "we just don't want to start it all over again." The defendant argues that these statements coerced the jurors to reach a verdict "so that they would not have to return the following day . . . ." In addition, he argues that the statements coerced the jury to reach a verdict "to avoid having the case retried."

In some circumstances, mentioning the possibility of a mistrial to a deliberating jury may be coercive. See *State* v. *O'Neill*, 200 Conn. 268, 284, 511 A.2d 321 (1986) ("[t]he potential of a mistrial, upon a deadlock, [is] often regarded as coercive "); *State* v. *Colon*, 28 Conn. App. 231, 246, 611 A.2d 902 (noting with approval that "court did not warn the jurors about the negative consequences of mistrial resulting from a deadlocked jury"), cert. denied, 223 Conn. 922, 614 A.2d 827 (1992). The potential problem with such a statement is that it risks incentivizing the jury to reach a unanimous verdict before it is ready to do so. *State* v. *O'Neill*, supra, 284 ("[b]ecause the possibility of disagreement by a jury and the consequent lack of a unanimous verdict is a protection conferred upon a criminal defendant in a criminal case by the [United States] constitution, for a judge to tell a jury that a case must be decided is not only coercive in nature but is also misleading in fact because to do so precludes the right of a defendant to rely on the possibility of a disagreement by the jury" [internal quotation marks omitted]). In determining whether the mention of a possibility of a mistrial is coercive, our Supreme Court has looked to the context in which and the circumstances under which the trial court gave the potentially problematic instruction and the probable effect of that instruction on the jury. See *State* v. *Ralls*, supra, 167 Conn. 422 ("[i]n assessing the

impact of these statements, however, we must consider them from the standpoint of their effect upon the jury in the context and under the circumstances in which they were given").

When a jury is deadlocked, the likelihood that a mention of a mistrial will be coercive is even greater. This is true because members of a deadlocked jury may understand the instruction as an incentive to abandon their conscientiously held beliefs in order to break the deadlock. The trial court may allay this risk of coercion, however, by further instructing the jurors that they should not abandon their conscientiously held beliefs or rush to reach a verdict. An example of such an additional instruction is a Chip Smith charge.[5] A Chip Smith charge is a balanced instruction typically given to deadlocked jurors to encourage them to work together toward a unanimous verdict, albeit without surrendering their conscientiously held personal beliefs based upon the evidence. "Better than any other statement . . . [such a charge] makes clear the necessity, on the one hand, of unanimity among the jurors in any verdict, and on the other hand the duty of careful consideration by each juror of the views and opinions of each of his fellow jurors . . . ." (Internal quotation marks omitted.) *State* v. *Feliciano*, 256 Conn. 429, 439, 778 A.2d 812 (2001). Even when a jury is not deadlocked, a Chip Smith charge may assuage the potentially coercive effect of any improper mention of a mistrial. See *State* v. *Ralls*, supra, 167 Conn. 425.

For example, in *State* v. *McArthur*, 96 Conn. App. 155, 899 A.2d 691, cert. denied, 280 Conn. 908, 907 A.2d 93 (2006), the jury sent a note to the court, stating, "We cannot come to a consensus on the kidnapping charge. Please help us to understand our options." (Internal quotation marks omitted.) Id., 179. The court informed counsel that it would give the jury a Chip Smith charge, but introduced that charge with the following potentially problematic statement: "Keep in mind how important it is for you to reach unanimous agreement, because if you can't agree, then the case as to the charge that you can't agree on is mistried and the case has to be tried again. There's no particular reason to believe that the next twelve of you will be any more conscientious and impartial than you are." (Internal quotation marks omitted.) Id., 179–80. Although we agreed with the defendant that the trial court "should not have given the prefatory instruction that it did"; id., 180; we held that the instructional error was harmless for two reasons. Id., 180–83. First, we noted that a full Chip Smith instruction immediately followed the offending language, thereby curing any error that might otherwise have arisen from it. Id., 182. Second, we noted that the jury did not announce its verdict immediately after the mention of the mistrial. Id., 183.

Another example is *Ralls*, which is apposite to the

present case in that the jury had not reported a deadlock. In that case, the court told the jury at about 5 p.m., after it had been deliberating for a little under three hours: "I cannot allow you to leave before I have some sort of a verdict. You can readily see," it explained, "if somebody got sick overnight, I would have to declare a mistrial, and this case would have to start all over again. It would be an impossibility." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Ralls*, supra, 167 Conn. 421. On appeal, our Supreme Court stated that "[f]or a judge to tell a jury that a case must be decided and that a mistrial would be an impossibility is not only compelling in nature but is misleading in fact. While a defendant is not entitled to an instruction that a jury may 'hang' . . . he is entitled to a jury unfettered by an order to decide. . . . When considered out of context, the statements in issue convey such an order, and, as such, constitute an impermissible, albeit undesigned, transgression into the province of the jury." (Citations omitted.) Id., 422.

Ultimately, however, the court in *Ralls* found no coercion in the challenged instruction for several reasons. Our Supreme Court looked to the context in which and the circumstances under which the trial court gave the instruction, first noting that the statements "were made because of the hour to explain the reason for retaining them through suppertime and to explain the potential for mistrial if a released juror were to become ill overnight." (Internal quotation marks omitted.) See id., 423. Moreover, the trial court had prefaced its instruction with, "I am not trying to hurry your deliberations at all. I want you to have time enough to consider them, and consider them with all the thought that you can." (Internal quotation marks omitted.) Id. In addition, our Supreme Court said, "The jury had shown no indication of a deadlock; there was no hint as to division." Id. Turning to the effect of the allegedly improper statement on the jury, our Supreme Court concluded that "the jury's final agreement was not reached because of submission to any improper urging of the court, but upon their own deliberations and the answer given to them at the last inquiry." Id., 426. In reaching that conclusion, the court relied on the fact that the jury continued to deliberate for almost four and one-half hours after the first mention of a mistrial and that the trial court gave a Chip Smith charge both before and after its mention of the possibility of a mistrial. See id., 425–26. Therefore, the court held: "We cannot conclude that, in the context and under the circumstances in which these statements were made, the jury were, actually or even probably, misled or coerced." Id., 426.

Against this background, we first address the comments made to the jury as a whole. Viewed in isolation, the challenged comments raised the specter of a possible mistrial in the event of a jury deadlock, thus improperly risking possible coercion of the jury to decide the

case and avoid a mistrial. Our case law directs us, however, not to examine the instructions in isolation, but instead to examine them in the context of the court's other instructions to determine if they probably had a coercive effect. See id., 422 ("[t]he charge to the jury . . . must be read as a whole, and an attempt to assert reversible error by culling a single phrase or inaccurate statement must fail unless it is reasonably probable that the jury were misled"). In examining the challenged instructions "from the standpoint of their effect upon the jury in the context and under the circumstances in which they were given"; id.; four points lead us to conclude that the defendant's jury in this case was not coerced into rendering a verdict. See id.

First, this is not a case where the jury had declared itself deadlocked when the prospect of a mistrial was first mentioned to it. The jurors did ask what would happen in the event that they could not reach a unanimous verdict; however, to the extent that this was any indication of a potential deadlock, there was no other indication that a deadlock existed. In fact, the jury's actions suggested the opposite, as evidenced by its own unsolicited suggestion that deliberations continue instead of going over to the following day to complete the replay of Byron McLennon, Jr.'s trial testimony.

Second, although the mention of a mistrial to a deliberating jury may at times be considered misleading even when the jury is not deadlocked, our case law holds that a Chip Smith charge can cure any such defect by assuring the jurors that, however undesirable a mistrial might be, they still should not change their minds merely to reach a unanimous verdict and avert a mistrial. See id., 425; see also *State* v. *McArthur*, supra, 96 Conn. App. 182. Although the court did not give a full Chip Smith charge in this case, on two occasions it gave the jurors the following instruction as to how they should consider each other juror's views in conducting their deliberations: "In the jury room, you should talk with each other about the case. Each of you must make your own conscientious decision, but only after you have considered all the evidence, discussed it fully with the others, and listened to the views of the others. Each of you should consider whether your views are fair and reasonable and try your best to decide the case according to the law. Do not hesitate to reexamine your own views and to change your mind if you are persuaded that you should do so, but do not surrender your honest opinion solely because your opinion is different from the other jurors or for the mere purpose of returning a verdict." This instruction, in its substance and effect, conveyed the essence of a Chip Smith charge. On the morning that the jury reached its verdict, the court repeated this instruction—almost verbatim—in response to the jury's third note. By advising the jurors of their duties as individuals to make their own conscientious decisions, and not to surrender their hon-

est opinions "for the mere purpose of returning a verdict," the court made it clear to the jurors that they should reach independent conclusions on the issues before them and should not feel coerced into rendering a verdict to which they did not personally agree.

Third, the statement by the court was in the context of responding to a question asked by the jury. The jury never indicated that it was actually deadlocked, but rather it asked what would occur, generally, if the jury could not reach a unanimous verdict. We have never held that the court is required to hide from the jury the fact that a mistrial is a possibility. Instead, our Supreme Court has been concerned with whether the jury is "unfettered by an order to decide." *State* v. *Ralls*, supra, 167 Conn. 422.

Fourth, the defendant argues that the court's statements coerced the jury into reaching a verdict so that it would not have to return the following day. To the extent that the defendant is arguing that the court was attempting to coax the jury to reach a verdict within a certain time frame, we reject this argument outright. First, the court gave the following initial instruction to the jury, at the request of the defendant: "You should take as much time as you feel is necessary to render your decision in a careful and just manner." At no time did the court imply to the jury that it must reach a decision within a particular time frame. To the contrary, the court was planning to have the jury return the next day to finish listening to the playback of Bryon McLennon, Jr.'s trial testimony. To the extent that the defendant is arguing that the court was forcing reluctant jurors to continue to deliberate, we also reject this argument. Requiring jurors to return to continue deliberating is not coercive in itself, absent a correlating requirement that the jury reach a verdict by a particular deadline. See *State* v. *Pinder*, supra, 250 Conn. 428 (telling jurors they would have to continue deliberating into evening not coercive because there was no implication they would have to reach verdict that evening).

Finally, we turn to the comments made to the individual juror, M.C. The statement that the defendant argues is improper, "we just don't want to start [the case] all over again," could be viewed as suggesting that the jury should reach a verdict to prevent the need to start the case all over again. However, we are not persuaded that this statement, viewed in the context of the entire record, was coercive. It would be pure supposition to conclude that M.C. told the other jurors about her conversation with the judge. In fact, M.C.'s actions up to that point gave every indication that she was discreet in requesting to speak with the judge in private; there is no reason to believe that she would have changed her approach. The defendant urges us to consider the timing of the allegedly improper statements to the jury and to M.C. Although he argues that the jury returned a

verdict "almost immediately" after M.C.'s conversation with the judge and just before 5 p.m., the record is inadequate for us to determine the accuracy of this argument. Therefore, there is no way of knowing whether the other jurors ever learned what the judge said to M.C., let alone whether they felt coerced to reach a verdict because of it.

Accordingly, examining the instructions "from the standpoint of their effect upon the jury in the context and under the circumstances in which they were given"; *State* v. *Ralls*, supra, 167 Conn. 422; it was not reasonably probable that the jury was coerced by the court's instructions into rendering a verdict. See id.

II

The defendant next claims that the court improperly excluded evidence that he proffered of an audio recording of a Bridgeport police officer calling into his dispatcher to report that his mother had called him and told him that she had almost been struck by a black, older model Jeep Cherokee that was speeding down Huntington Road with its headlights off around the time that the police received a report of shots fired on nearby Edna Avenue. The state objected to this evidence on the ground that it was hearsay within hearsay. We conclude that even if the officer's report of his mother's statement to him was admissible under the business records exception to the hearsay rule, the officer's mother's statement to him was not admissible under any exception to the hearsay rule, and thus was properly excluded.

The defendant offered the audio recording of the officer's statement on the last day of evidence. In that recording, which was played for the court, a police officer called his dispatcher to ask for the exact time of the "shots fired" call that had been broadcast in connection with this case. The dispatcher responded that the call had come in at 22:00 hours. The officer said, "All right. . . . My mom called me. She was turning on Palm Street. A black older model Jeep Cherokee was flying with lights off about that time down Huntington Road toward [inaudible] Avenue/Noble Avenue area. It almost struck her, that's why she called me up and let me know." After the dispatcher repeated the officer's report back to him, the officer added that the vehicle "blew through a light" on Huntington Road and Boston Avenue, then turned on its headlights after almost striking his mother.

The state objected to this evidence, characterizing it as "totem pole hearsay." According to the state, the recording contained two levels of hearsay: (1) the police officer's statement to the dispatcher and (2) the police officer's mother's reported statements to the police officer. After listening to the recording, the court sustained the state's objection, stating, simply, "I don't see the

officer's report on the mother's out-of-court statement as being admissible. Therefore, the state's objection is sustained." The court did not specify on which ground it was ruling.[6]

The defendant claims on appeal that the court erred in ruling that the recording was inadmissible. The defendant argues, as he did at trial, that the police officer's mother's reported statements were admissible under the spontaneous utterance exception and that the police officer's statements to the dispatcher were admissible under the business records exception. Because we conclude that the mother's statements were inadmissible as hearsay, it is unnecessary for us to address whether the police officer's recorded statements to the dispatcher were admissible as a business record.[7]

"Unless an evidentiary ruling involves a clear misconception of the law, the [t]rial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling . . . ." (Internal quotation marks omitted.) *State* v. *St. John*, 282 Conn. 260, 270, 919 A.2d 452 (2007). "[W]hether a statement is truly spontaneous as to fall within the spontaneous utterance exception will be reviewed with the utmost deference to the court's determination." *State* v. *Saucier*, 283 Conn. 207, 219, 926 A.2d 633 (2007). "In determining whether there has been an abuse of discretion, the ultimate issue is whether the court . . . reasonably [could have] conclude[d] as it did." (Internal quotation marks omitted.) *State* v. *Davis*, 298 Conn. 1, 11, 1 A.3d 76 (2010).

"An out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies." (Internal quotation marks omitted.) *State* v. *Wargo*, 255 Conn. 113, 127, 763 A.2d 1 (2000). Section 8-3 of the Connecticut Code of Evidence sets forth exceptions to the hearsay rule that apply regardless of the availability of the declarant. Conn. Code Evid. § 8-3. One such exception is the spontaneous utterance exception set forth in § 8-3 (2), which applies to: "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Under § 8-3 (2), an out-of-court declaration will not be excluded under the hearsay rule when the following factors are established: "(1) the declaration follows a startling occurrence, (2) the declaration refers to that occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrication by the declarant." *State* v. *Kelly*, 256 Conn. 23, 41–42, 770 A.2d 908 (2001).

In determining whether a declaration is admissible

as a spontaneous utterance, the court should look at various factors, including "[t]he element of time, the circumstances and manner of the accident, the mental and physical condition of the declarant, the shock produced, the nature of the utterance, whether against the interest of the declarant or not, or made in response to question, or involuntary, and any other material facts in the surrounding circumstances . . . ." *Perry* v. *Haritos*, 100 Conn. 476, 484, 124 A. 44 (1924). "The relation of the utterance in point of time to the accident or occurrence, while an important element to be considered in determining whether there has been opportunity for reflection, is not decisive." Id. Instead, "[t]he overarching consideration is whether the declarant made the statement before he or she had the opportunity to undertake a reasoned reflection of the event described therein." (Internal quotation marks omitted.) *State* v. *Kirby*, 280 Conn. 361, 376, 908 A.2d 506 (2006).

Here, assuming that the mother's reported experience of almost being struck by a speeding vehicle was a startling event that she personally had witnessed and described to her son, the remaining issue that the court had to resolve before admitting the statement was whether the mother was still under the stress of that startling event when she spoke to her son about it. The record does not contain any evidence as to the time when the mother called the police officer in relation to the time of the event described in her reported statement. Although time is not necessarily dispositive, a time line of the events may have provided at least some evidence as to whether the mother had time to reflect on the events before she made the reported statement to the police officer. Furthermore, the audio recording gave no indication that the officer's mother was still under stress at the time she made her reported statement to the police officer. The police officer did not report that his mother called him while, or shortly after, seeing the speeding vehicle, nor did he report that his mother was or seemed to be upset. Without such evidence before it, the court had no way of knowing whether the police officer's mother had called someone else before she called her son, or done anything else in the interim that gave her time for " 'reasoned reflection' . . . ." Id.; see also *State* v. *Gregory C.*, 94 Conn. App. 759, 771–72, 893 A.2d 912 (2006) (statement not spontaneous utterance when declarant spoke with her friend at length before making statement). In sum, the court reasonably could have ruled the mother's statement inadmissible under the spontaneous utterance exception to the rule against hearsay because the court lacked any record basis for determining that she made it under circumstances negating the opportunity for deliberation and fabrication. We conclude on that basis that the trial court did not abuse its discretion in excluding the recording reporting her statement from evidence.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] After the close of evidence but prior to the start of deliberations, the court had excused one juror and replaced him with one of two alternate jurors.

[2] One possible meaning was that the entire trial would have to start all over again. Another, however, was that deliberations would start all over again if the juror was replaced by an alternate juror.

[3] It is unclear whether M.C. remained in the courtroom or returned to the jury room after her conversation with the judge. The transcript does not reflect that M.C. left. The defendant claimed in his motion for a new trial that M.C. returned to the deliberation room. Neither the prosecutor nor the trial judge challenged that claim.

[4] The record does not reveal how the court came to learn that the jurors wished to continue their deliberations.

[5] The Chip Smith charge was originally set forth in *State* v. *Smith*, 49 Conn. 376, 386 (1881), and, as updated in *State* v. *O'Neil*, 261 Conn. 49, 801 A.2d 730 (2002), states in its entirety as follows:

"The instructions that I shall give you now are only to provide you with additional information so that you may return to your deliberations and see whether you can arrive at a verdict.

"Along these lines, I would like to state the following to you. The verdict to which each of you agrees must express your own conclusion and not merely the acquiescence in the conclusion of your fellow jurors. Yet, in order to bring your minds to a unanimous result, you should consider the question you have to decide not only carefully but also with due regard and deference to the opinions of each other.

"In conferring together, you ought to pay proper respect to each other's opinions and listen with an open mind to each other's arguments. If the much greater number of you reach a certain conclusion, dissenting jurors should consider whether their opinion is a reasonable one when the evidence does not lend itself to a similar result in the minds of so many of you who are equally honest and equally intelligent, who have heard the same evidence with an equal desire to arrive at the truth and under the sanctions of the same oath.

"But please remember this. Do not ever change your mind just because other jurors see things differently or to get the case over with. As I told you before, in the end, your vote must be exactly that—your own vote. As important as it is for you to reach a unanimous agreement, it is just as important that you do so honestly and in good conscience.

"What I have said to you is not intended to rush you into agreeing on a verdict. Take as much time as you need to discuss the matter. There is no need to hurry." (Emphasis omitted.) Id., 74–75.

[6] During the argument about whether the audio recording was inadmissible as hearsay, the state briefly made a claim that the court should exclude the recording on relevancy grounds. The defendant never responded to this argument at trial, and thus the substance of the argument by both the state and the defendant concerned hearsay. Because hearsay was more clearly argued at trial and because we determine that the evidence was inadmissible as hearsay, we will not address the relevancy claim.

[7] Although we assume without deciding that the police officer's statements to the dispatcher fall under the business record exception to the hearsay rule, we have little doubt that this recording of a police officer calling the police dispatcher was made in the regular course of police work and that it was in the regular course of police work to make such a recording. See *State* v. *Torelli*, 103 Conn. App. 646, 659, 931 A.2d 337 (2007) ("To be admissible under the business record exception to the hearsay rule, a trial court judge must find that the record satisfies each of the three conditions set forth in [General Statutes] § 52-180. The court must determine, before concluding that it is admissible, that the record was made in the regular course of business, that it was the regular course of such business to make such a record, and that it was made at the time of the act described in the report, or within a reasonable time thereafter." [Internal quotation marks omitted.]).